MARSHALL H. HOLMES *vs.* DAVID J. HALDE.

Kennebec.     Opinion June 12, 1882.

*Physician. Master and servant. Damages. Negligence.*

The plaintiff testified that he attended an institution three terms, three months each term, that there were lectures on medicine and medical studies, and all branches of surgery taught, that there were over two hundred students, that he paid tuition, completed the course and paid thirty dollars for a

diploma; and he described the building, its location, etc. *Held;* That the evidence was sufficient to lay the foundation for the introduction of the diploma which he received from the institution, and which, when its execution was proved, was legal evidence tending to prove that the plaintiff received a medical degree at that institution.

In an action for damages occasioned by the negligence of the servant of the defendant in driving a horse on a public way, the presiding justice instructed the jury that, "he is to be deemed the master who has the choice, the selection, the direction and control, and the right to discharge the alleged servant; whose will is represented by that alleged servant, not only as to the result of the work performed or to be performed by the servant, but in all its details, in the means by which the work is performed," and illustrated the rule by the familiar case of those known as contractors in the erection of buildings. *Held;* That the rule of law given the jury by which the relation of master and servant should be determined was correct.

In such an action where the plaintiff claimed damages for loss of business as a physician, it is not error to instruct the jury that the plaintiff is not prohibited from recovering damages for loss of business as a physician, although he has no such degree from a public medical institution as would entitle him to maintain an action for professional services.

In such an action it is not error to refuse a requested instruction, "that if they (the jury) find that by reason of the horse being frightened, or otherwise became uncontrollable and Beaulieu [the driver] could not guide him and the collision resulted from that, the defendant would not be liable."

ON exceptions from the superior court.

An action to recover damages for injuries to person and property on account of alleged negligence and unskillfulness on the part of the defendant's servant in driving a horse in a public street of Waterville, March 10, 1880. The writ was dated March 31, 1880, and contained an averment, that the plaintiff by reason of the injury "was disabled for a long time from doing his ordinary business as a physician and surgeon in regular standing and practice."

At the trial the plaintiff testified as follows :

*Question.* What is your business? *Answer.* Physician. *Mr. Webb,*—I object to that. . . . [Witness produces two documents purporting to be diplomas.] *Witness,*—This is my diploma which I received at Philadelphia, granted at the time it purports to have been. *Mr. Webb,*—I object to the question. . . . *Witness,*—I attended a course of medical lectures at the institution named in the diploma. I was there three terms. The last was in 1866. I was there three months

at a time. There were lectures on medicine and medical studies in that institution. [Objected to.]

*Question.* How large were the classes? [Objected to and admitted.] *Answer.* There were eighty-five in the last class that I was in, when I graduated, or about that.

*Question.* Was that a public institution at which any one could attend by paying the fees required? [Objected to, and the witness was allowed to describe the building and the institution.] *Answer.* The building was on Sixth street, College Hall, so called, a large double building, three stories, I think. The second story was occupied for the institution. And the first term I was there I think there were about two hundred and some odd of students, and about as many the second; and the third term, there were more. I have forgotten how many professors there were, but those names on the diploma were all professors. Should guess the building was one hundred feet one way and forty the other. All branches of surgery were taught there. I completed the full course. I had studied medicine, years before, with an old physician in Searsport, Maine, old Doctor Beals; I was with him two years, I think; perhaps not all the time, but off and on. Cannot tell whether all that were in the faculty signed my diploma when I graduated; I think the most of them did, though.

Counsel for plaintiff then offered in evidence, certificate of Eclectic Medical College of Pennsylvania, to Marshall H. Holmes, dated January 25, 1866, which was objected to and admitted. Also offered certificate of Eclectic Medical Society of the state of Maine, dated June 23, 1869, which was objected to and admitted. Also placed in evidence c. 597, of the private and special laws of 1868.

On cross-examination the witness testified :

*Question.* I now produce for your inspection the paper which you have put in, entitled Eclectic Medical College of Pennsylvania, dated January 25, 1866, and signed Z. C. Howell, president, (I cannot read the secretary's name.) Joseph Sites, one of the professors, Henry Hollellenbech, another professor, Joseph P. P. Fitler, another professor, John Buchanan, another professor,

A. W. Clark, another professor, E. Downs, another professor. Will you state whether there is any seal upon that diploma, made by impression upon the paper? *Answer.* It is a seal as they put on to all diplomas, printed on a ribbon of silk or satin. Think I was first at this college in 1862 or 1863, I cannot say which. I then resided in West Waterville where I was in practice. Think I went to the college in October. Was gone about three months. This was the first medical school I had ever attended. Think I went again the next spring, the summer time, June term I think, but not certain. That would be in 1863 or 1864. I staid three months. I next went in October, 1866, and staid about three months. Had not before attended a medical college regularly. I have been in a number of medical schools before that in Philadelphia. Don't mean that I attended them. This diploma certifies that I was there three terms. I was there when I received this diploma. I took it from Philadelphia to West Waterville with me. Think it was delivered to me by Mr. Sites. I paid my regular college fee. For the diploma I paid thirty dollars to the dean of the college, Mr. Sites, I think; I don't recollect. Think Howell was president when I was there. I cannot describe him. He was a stout man about forty-five or fifty years old. Cannot recollect the name of the professor of chemistry when I was there. Sites was professor of obstetrics, and Clark of materia medica, I think, but am not certain. I haven't looked at that diploma or thought anything about it. Downs was professor of surgery. I recollect him very well.

*Question.* John Buchanan is put down here as professor of surgery? *Answer.* O yes, I am mistaken. He was a stout thick-set man, I should think about forty when I saw him. He might not have been over thirty-five or thirty-eight. Don't know where he is now. The last time I heard of him he was in what they called his place at five hundred and fourteen Pine street. Think I had a journal from that college within a year and a half or two years. That is all I know of him. That diploma is in just the same condition now that it was when I received it. The lettering is precisely the same for anything I

know. It has been in my possession all the time, hung up in my office.

The presiding justice instructed the jury as follows:

. . . "For the purpose of this trial, gentlemen, I instruct you that if you should find, under the rules that I shall proceed to give you with respect to master and servant, that in performing that particular service of driving John Canning from the railroad station to the defendant's house, George Beaulieu was acting as the servant of the bishop as representative of the catholic church, although for certain other purposes he was the servant of the defendant, the defendant in this case would not be liable, whoever else might be liable; and it is unnecessary for you, as I have intimated, to pursue that inquiry.

"Now, he is to be deemed the master who has the choice, the selection, the direction and control and the right to discharge the alleged servant; whose will is represented by that alleged servant, not only as to the result of the work performed or to be performed by the servant, but in all its details, in the means by which the work is to be performed. To illustrate this relation between master and servant and distinguish it from other kinds of employment, take the familiar case of those known as contractors. The owner of a lot about to erect a building upon it, contracts with B to build the brick walls of that structure for a certain specified sum, to be paid upon the completion of the work; or work to be done, if you please, in accordance with certain plans delivered to the contractor. That contractor represents the will of the owner of that lot with respect to the result of that work. He is answerable to him for the result of it as called for by the plans, not in its details, not in the means by which the work is to be performed. The owner of the lot under that arrangement would have no authority to direct or control the laborers, the hod-carriers or the brick-layers; to select them, or to discharge them if they proved unfaithful; no right to discharge one and employ another in his stead for the same kind of service. All the details and all the means would be under the direction and control of the contractor. And if an accident, an injury should result from the negligence of a hod-

carrier or brick-layer, the contractor would be answerable to that particular party injured by the negligence and not the owner of the lot, although the owner of the lot in the end would receive the benefit of that work. You perceive that the rule, carefully examined, is a just and reasonable one. The law says it is just and reasonable that he who has the selection of the agent, the servant, the right to dismiss him at any time for unfaithfulness on the slightest intimation or indication of carelessness, should be responsible for any injury resulting from a want of care or skill on the part of such servant. But as the reason of the rule does not apply, so should the rule itself not apply where the person sought to be charged for the negligence, does not have such control over the servant, such right to employ him or discharge him. For the purpose of insuring greater precision of statement and more carefully guarding the rights of the parties here, I have, during the progress of the arguments this afternoon, reduced to writing, a few sentences covering the propositions which I will give you, as applicable to this particular case.

"It is conceded that the defendant was the owner of the team driven by Beaulieu at the time of the collision; but if you find that the catholic bishop of the Portland diocese, having the power of appointing and removing the defendant as superintending priest of the Waterville mission, had also not only the right to require a report of the result of the mission, and a business settlement, and a payment of the surplus receipts of the mission at the end of each year, but the right to direct as to the details of the work of the mission, and the means by which that work was accomplished, and further find that under the relations existing between the bishop and the defendant at that time, the bishop had the direction and control of Beaulieu in the performance of such duties as he was then performing, and the right to discharge him at any time from such service for carelessness or unfaithfulness, or any other cause, and select and employ another in his stead, and the service then performed by Beaulieu was for the benefit of the bishop, as representative of the catholic church,

you would be authorized to find that Beaulieu was the servant of the bishop and not the servant of this defendant, and this defendant would not be responsible. But if, on the other hand, you find the defendant, as conceded, the owner of the team so driven by Beaulieu, and find that under the relations between the bishop and the defendant, the defendant did not represent the will of the bishop as to the details of the work of the mission and the means by which it should be accomplished, and that the defendant himself had the selection and employment of Beaulieu for such service as he was then performing, and the right to discharge him at any time and choose another in his place, and had the entire control and direction of Beaulieu with respect to such duties as he was then performing, then, although the bishop, as representative of the church, directly or indirectly received the benefit of such service, you would be authorized to find the defendant answerable for the results of Beaulieu's negligence, the other conditions, to which your attention will be called, being fulfilled. . . .

"I instruct you as matter of law that the plaintiff is not prohibited from recovering damages for loss of business as a physician, although he had no such degree from a public medical institution or no such license from the Maine Medical Association, if he satisfies the jury that he actually received cash for his services. It would be a question of fact for the jury whether his business was a profitable one or not without such degree or such license; whether he would receive by voluntary payments from his patients, compensation for his services. You have heard the arguments of the counsel upon the one side and the other in reference to his loss of business as a physician. This is proper matter for your consideration. It is proper for you to consider what amount of cash he received out of the charges which he made; but, as is argued by counsel, finding the ratio of charges might be a proper manner of determining the relative loss of services prior and since the injury." . . .

*Mr. Webb:* Will your honor instruct the jury that if they find that by reason of the horse being frightened or otherwise, or became uncontrollable and Beaulieu could not guide him, and

the collision resulted from that, the defendant would not be liable?

*The Court:* I cannot give you that rule.

The verdict was for $1610.04

*Joseph Baker*, ( *F. A. Waldron* with him, ) for the plaintiff, cited: Abbott's Trial Ev. 382 ; *Finch* v. *Gridley's Ex'r*, 25 Wend. 469 ; Sedgwick on Damages (6th ed.) 103, *92 ; *Nebraska City* v. *Campbell*, 2 Black. 590 ; *Wade* v. *Leroy*, 20 How. 34 ; *Ballou* v. *Farnum*, 11 Allen, 73 ; *N. J. Express Co.* v. *Nichols*, 33 N. J. L. 434 ; Shear. and Red. Negligence, § § 71, 73, 74, 77, 79 ; 2 Hillard on Torts, 436 ; *McCarthy* v. *Second Parish Church of Portland*, 71 Maine, 318 ; *Eaton* v. *E and N. A. R. R. Co.* 59 Maine, 520 ; *Murray* v. *Currie*, L. R. 6 C. P. 24.

*E. F. Webb*, for the defendant. R. S., c. 13, § 3, provides that no one "shall recover any compensation for medical or surgical services unless . . . he has received a medical degree at a public medical institution." . . . The plaintiff in his writ claims special damage for loss of profits of business as a physician and surgeon, in regular standing. It therefore became necessary for plaintiff to prove he was such, and offered those papers for that purpose. I submit that the papers offered do not establish a " medical degree " or a " public medical institution." The corporate existence of the corporation and the issuing of the diploma are matters of record and are to be proved by the records, if there are any. The same John Buchanan who sold this diploma is the same one now in prison in Philadelphia for making such sales, and his confession made since the trial is a matter of history.

The defendant was prejudiced by the example given by the court of a " contractor " to illustrate the relation between master and servant. A " contractor " of the class described by the court is one who renders service in the course of independent occupation and represents the will of his employer only as to *results*, and not as to the *means* by which it is accomplished. Sherman and Redfield on Negligence, § 76. As an abstract rule of law it is correct, but not being applicable to this class of cases it misled the jury as it is a forcible example given in the books relating to that class of contractors who agree to render results and not

·observe in the least, the will of its employer as to the means. A "contractor" hires for himself, and does not submit to the will of his employer, the employer has no control over the "contractor," when he submits he ceases to be a "contractor" and becomes a servant, and a "contractor" is neither agent or servant of his employer. Sherman and Redfield, § § 77, 81. The defendant was in no way responsible for results and neither party so claim, and the example given by the court was not germain to the issue and prejudiced the defendant.

The defendant excepts to that part of the charge which allows the jury to give plaintiff damages for loss of business as physician, although he had not qualified as prescribed in R. S., ·c. 13, § 3. It is true, the statute does not affirmatively declare contracts between an unlicensed physician and his patients to be void, but they are so in effect. Rights which the law will not ·enforce, because against public policy, are illegal rights; the law does not refuse to enforce legal contracts. The legislature has the right to take away the remedy for the recovery of debts. As in the case of a public school teacher without certificate, *Jose* ·v. *Moulton*, 37 Maine, 367, or of a physician without being ·qualified, *Thompson* v. *Hazen*, 25 Maine, 104, or an attorney without having taken the oath, &c. as in *Perkins* v. *McDuffee*, ·63 Maine, 182, or contracts executed upon the Lord's day, or to recover the price of spirituous liquors sold, or for the sale of goods bought to be carried about and peddled, where the statute required a peddler's license, as in *Robinson* v. *Howard*, 7 Cush. 611, or for services rendered in peddling goods for another ·without license, as in *Stewartson* v. *Lothrop*, 12 Gray, 52, or to recover commissions as a broker without a license, as in *Harding* v. *Hagar*, 63 Maine, 515, or for services as a "medical clairvoyant," as in *Bibber* v. *Simpson*, 59 Maine, 181, or the price ·of hay pressed and put up in bundles unless branded in a certain manner, as in *Pickard* v. *Bayley*, 46 Maine, 200. There can be no damage for loss of profits to a business which is not entitled to the security and protection of the law. The plaintiff is not aided because he received or might receive gratuities, for no action lies for gratuities. *Wells* v. *Wills*, 4 E. C. L. 98,

(8 Taun. 264;) *Boyter* v. *Dodsworth,* 6 T. R. 681. There are some authorities in point. In *Sherman* v. *Fall River Iron Works Co.* 5 Allen, 213, it is held, "that an unlicensed keeper of a livery stable cannot recover damages for an injury to his business caused by the escape of gas through the ground into the water of a well upon his premises."

In Sherman and Redfield on Negligence, § 599, *a,* the rule is stated as follows : "Nothing can be allowed for the loss of profits in an illegal business, such, for example, as a traffic carried on without the license required by statute." It was so held as to an unlicensed liquor store. *Kane* v. *Johnston,* 9 Bosw. 154.

In *Pickard* v. *Bayley et al.* 46 Maine, 200, it is held, "That no action can be maintained against the owner of a vessel for the non-performance of a contract to transport hay, if the bundles are not marked as the statute requires. Nor for neglect in taking care of the hay after its delivery to them for shipment, whereby the hay was greatly damaged."

In *Buxton* v. *Hamblen,* 32 Maine, 448, it is held, "That no damage can be recovered for non-fulfillment of a contract for sale of pressed hay not branded as the statute requires." Trover will not lie for a note given for an illegal consideration. *Morrill* v. *Goodenow,* 65 Maine, 178. The defense of illegality is founded upon consideration of public policy and will prevail, whatever the form of action may be. *Id.* 179.

In *Lord* v. *Chadbourne,* 42 Maine, 441, APPLETON, J., in discussing a similar principle, says : "The right to take away the remedy for the recovery of debts and for the recovery of compensation in damages for torts, rests upon similar grounds. For a long time usury was a valid defence to a loan of money made against the provisions of the statute on this subject. So the right to recover has been denied, because regulations as to the survey, or the inspection of articles sold have been disregarded, though in all such cases the articles sold were none the less valuable, and the seller was none the less in equity entitled to compensation for the thing sold. Much more, then, may the aid of the law be denied, when the plaintiff seeks compensation for what was held in defiance of its mandates, and with intent to disregard its clearest prohibitions."

In 1 Hillard on Torts, c. 4, § 25, it is stated as follows : "And the same principle has been extended to a claim for damages for an act somewhat more remotely connected with the wrongful conduct of the plaintiff. Thus where the plaintiff was proprietor of a public building kept for the purpose of exhibiting the art of boxing . . . by persons skilled in that art, for an admission fee, and brought an action for a libel contained in a newspaper, imputing misconduct to him as such proprietor, and proved that he had sustained damages thereby ; held it was an illegal occupation as it tended to prize fighting, and the case was given to the defendant." It seems a rational rule, that if a business be illegal and outlawed, and the law refuse to shield and protect it, it will deny its relief to profits annexed to such illegal business.

LIBBEY, J. The first exception relied on by the defendant, is to the admission of the plaintiff's diploma from the Eclectic Medical College of Pennsylvania. By R. S., c. 13, § 3, one of the requirements to authorize a physician to recover compensation for his services, is that he " has received a medical degree at a public medical institution in the United States." The statute does not require that the institution shall be a corporation. It is sufficient if it be a medical institution or school to which the public have a right of admission and instruction, on compliance with the rules and regulations established therefor, and which has the right by law to confer degrees. We are of opinion that the evidence upon this point was sufficient to lay the foundation for the introduction of the diploma, which, when its execution was proved, was legal evidence tending to prove that the plaintiff received a medical degree at that institution.

The second exception is to the rule of law given to the jury by the court, by which the relation of master and servant should be determined. We think the charge on this point presented to the jury the rule of law carefully, fully and correctly. It is in harmony with the law as declared by this court in *Eaton* v. *European and North American Railway Company*, 59 Maine, 520 ; and *McCarthy* v. *Second Parish of Portland*, 71 Maine, 318.

The third exception is to the charge of the judge upon the question of damages. The clause of the charge excepted to is as follows : " But I instruct you as matter of law that the plaintiff is not prohibited from recovering damages for his loss of business as a physician, although he had no such degree from a public medical institution, or no such license from the Maine Medical Association, if he satisfies the jury that he actually received cash for his services."

We think this instruction correct. The action is for damages resulting from a personal injury. If, by the injuries received, the plaintiff was deprived of his capacity to perform his ordinary labor, or attend to his ordinary business, the loss he sustained thereby is an element of damages. The true test is what his services might be worth to him in his ordinary employment or business. It is not what sum he might legally recover for such services, but what he might fairly be expected to receive therefor. What he had previously been receiving for his services in his business, is proper evidence on this point. A clergyman who has no fixed salary, but is dependent entirely upon voluntary contributions for his compensation for his services, as in some of our churches, may have an income, and if by an injury he is deprived of his capacity to perform his duties, might lose that income, and suffer as much loss as if he was receiving a salary fixed by contract ; and still he could not enforce the payment of anything from his church or society.

The plaintiff was practicing his profession as a physician. If he had received no medical degree or license, still he was not pursuing a business in violation of law. The law would afford him no remedy for the collection of his charges for his services, but if his patients voluntarily paid him therefor, so that he was receiving an income of a certain amount for his services, that was the measure of the value of his capacity to render them, and might be fairly considered as evidence tending to show that he would receive similar compensation in the future.

This question was fully considered in England in the recent case, *Phillips* v. *London and South, Western Railway Company*, 42 L. T. Rep. N. S. 6. The plaintiff was a physician, and

brought his action for a personal injury by which he was incapacitated from attending to his business. At the trial, he proved that before the injury he had been receiving large special fees in the nature of gratuities from wealthy patients, which, with his regular charges, gave him an income of about five thousand pounds per year. The jury rendered a verdict for the plaintiff for sixteen thousand pounds. The case was taken to the court of appeal, and one of the questions was whether the jury was properly permitted to consider the special fees in estimating the value of the plaintiff's business; and the court held that it was a proper matter for their consideration.

The authorities cited and relied upon by the counsel for the defendant, are cases where the business lost or damaged was prosecuted in violation of law, and hence are clearly distinguishable from this case.

The defendant requested the court to give the jury the following instruction : " That if they find that by reason of the horse being frightened, *or otherwise became uncontrollable*, and Beaulieu [the driver] could not guide him, and the collision resulted from that, the defendant would not be liable." It is claimed that this requested instruction should have been given. It was properly refused, because it does not embrace the element that the horse was reasonably safe for the use to which he was put on that occasion, nor the element that the horse became uncontrollable without the fault of the driver. Upon this point the instruction given was sufficiently favorable to the defendant.

It is unnecessary to consider the other requests for instructions, as they all relate to the rule of law by which the jury should determine whether the driver of the horse was the servant of the defendant, in regard to which the jury was fully and correctly instructed.

*Exceptions overruled.*

APPLETON, C. J., WALTON, BARROWS, DANFORTH and PETERS, JJ., concurred.