GRACE N. JOHNSON
*vs.*
MAINE CENTRAL RAILROAD CO.

Lincoln.    Opinion, August 14, 1944.

*Harvey D. Eaton,*

*Arthur Garfield Hays,* New York, for the plaintiff.

*Perkins, Weeks & Hutchins,* for the defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MURCHIE, CHAPMAN, JJ.

MANSER, J. This action is for personal injuries sustained as a result of a railroad grade crossing accident. At the conclusion of the evidence, the court ordered a verdict for the defendant. The case comes forward on exceptions to that ruling and exceptions to the exclusion of certain evidence.

The plaintiff was operating a Ford coupe and the collision occurred with a steam passenger railroad train at the Main Street crossing in Wiscasset on the morning of June 26, 1938. The plaintiff sustained grievous injuries. The train, consisting of engine, baggage car, two coaches and three sleeping cars (not occupied), was being operated from Portland to Rockland, and was scheduled to stop at the Wiscasset station, about 800 ft. beyond the crossing. The plaintiff had started out at about 5:30 A.M. standard time from a place near Thomaston, and had just crossed the bridge over the Sheepscot River entering Wiscasset. This bridge is a long one, 22 ft. wide, and runs straight towards the crossing and at right angles thereto. There is a slight 1% down grade for about 900 ft. to the proximity of the crossing, where the road levels off. The roadway of the bridge is of asphalt planking, and from the bridge is of bituminous construction. There are buildings in the vicinity of the crossing, one located 17 ft. south of the tracks on one side of the road, and another 25 ft south on the other side. The distance between the two buildings is 50 ft.

The plaintiff alleges due care on her part, and that the railroad was negligent because of a lack of suitable and sufficient signs, signals and warnings to approaching travelers.

According to the undisputed testimony, the visual evidences of the railroad crossing at grade were as follows:

Two parallel sets of railroad tracks; a standard railroad sign erected under State direction 259 ft. from the crossing; a pole carrying cross bars, bearing the sign "Railroad Crossing"; a flashing signal, having six lights, with oscillating arm and disc swinging thereunder; railroad gates or bars extending upwards; a gateman's shanty, and finally the train itself approaching at a speed of from 8 to 10 miles per hour, but somewhat obscured by the buildings near the crossing.

The audible evidences were: Engine whistle started at the whistling post, a thousand feet away, and a second time

when in closer proximity to the crossing; the engine bell, operated automatically by air valve, and ringing continuously from the whistling post until the accident had taken place; a gong attached to a wigwag signal and ringing steadily; the noise of a steam passenger train in operation.

The plaintiff, possessed of normal vision and hearing, was oblivious of all these portents of peril until the forward part of the engine passed in front of her car, when it was but a few feet away. The collision immediately followed.

The plaintiff was a summer visitor who was unfamiliar with the highway route, having passed over it but once and then travelling in the opposite direction. Her explanation of her failure to apprehend any of the signals of an approaching train directly crossing her line of travel was that weather and road conditions prevented. She asserts that it was raining hard, that it was misty and foggy, that she was peering ahead to keep on the highway, that she had previously passed over a long bridge which had metal expansion joints every 52 ft. and which caused a recurrent thumping sound, and that as a result of all these factors, she had slowed down to a speed of 20 miles per hour. She contends that she was not chargeable with any want of due care under the circumstances.

It is true that ofttimes safety methods are designed, as for instance by the abolition of grade crossings, to prevent accidents which might otherwise be caused by the failure of travelers to make use of their normal faculties. The State, however, permits grade crossings in many places, even in congested areas, and travelers must expect to find them throughout the country districts. The law does require that the railroads exercise care and prudence commensurate with the degree of danger involved. *Dyer* v. *M. C. R. R. Co.*, 120 Me., 154, 113A., 26; *Smith* v. *M. C. R. R. Co.*, 87 Me., 339, 32 A., 967.

Under ordinary circumstances, it might have been argued

that where there were gates installed at a crossing, which were not lowered at the time a train approached the crossing, such open gates invited passing, while closed gates might have prevented it. In the present instance, however, the plaintiff did not see the gates at all, so she cannot complain that she was thus led into peril. The record also shows that a short time before, the Public Utilities Commission had issued an order for this particular crossing, directing that the railroad "continue to operate and maintain an automatic signal with circuit control except that said signal shall be cut out and in lieu thereof continue manually operated double gates during such hours of the day as freight train switching movements are being made over the crossing, or within the circuit controlling the automatic signal. All train or car movements shall be restricted to not more than ten miles per hour."

This evidently was to dispense with the automatic audible signals at times when they would otherwise continue to operate over considerable periods, and be a cause of annoyance to persons in the vicinity. In any event, the railroad cannot be deemed negligent for complying with an order of the supervisory State authority.

Counsel for the plaintiff insists that greater precautions should have been taken by the railroad to protect travelers ignorant of the proximity of the railroad tracks and obliged to cope with rain, wind, fog and mist. The only conclusion that can be reached from the testimony is that, either her mind was so absorbed with the difficulties of operating her car under the circumstances, which made her oblivious to sounds and signals clearly heard by others much farther away from the scene, or that weather conditions were such that she should have stopped and waited for them to clear, as is sometimes necessary in severe temporary storms.

It is also claimed by counsel that the view of the plaintiff was restricted by buildings in the near vicinity to the cross-

ing, by the general background of trees and foliage on the sides of the road beyond the crossing, by advertising signs and the upward slope of the road in the distance. The plaintiff testified that she took note of a sign and of the product advertised thereon, and she also saw some silver-covered oil tanks. It is thus apparent that her sight was not blinded, but that she failed to see signs that were of far greater importance to her traveling safety. Neither does it explain nor excuse her failure to hear.

The "Look and Listen" rule is firmly established in this State. In the case of *Borders* v. *B. & M. R. R.*, 115 Me., 207, at 211, 98 A., 662, 664, and which hinged upon the absence of a gateman whose duty it was to operate the railroad gates, the general rule is well stated as follows:

> "The defendant contends further, in effect, that even if the flagman was absent, due care on the part of the plaintiff required him to listen, and to look, and if he could not see, to stop, before he reached the crossing, and particularly so, because it was a "blind crossing." Though negligence is a question for the jury, when the facts are in dispute, or when intelligent and fair minded men may reasonably differ in their conclusions, yet, because the inference of negligence in such cases is so indisputable, the rule is firmly established in this State and elsewhere that it is as a matter of law negligence per se for one to attempt to cross a railroad track without first looking and listening for a coming train if there is a chance for doing so. . . . It is the duty of the traveler to listen and to look, and if obstacles prevent his looking, he should stop if there is any room for doubt. The rule of due care is not satisfied with any lesser degree of watchfulness. And if all travelers observed this rule the number of railroad crossing accidents would be re-

duced to a negligible minimum. In this case the plaintiff did not look until too late." See also cases cited.

If she had listened, she could indubitably have heard warnings which a number of witnesses testified were clearly audible, and whose testimony is not denied.

The "Look and Listen" rule is not confined to those who are conversant with the situation and know that a railroad crosses the highway in that location. Travelers from other States who are not familiar with the territory are not immune from the operation of this rule. As well might it be said that a Maine automobilist in Boston could drive through red stop lights on the streets and claim that he was absolved from responsibility because he was looking at something else and did not see the signal.

In *Witherly* v. *B. & A. Ry.*, 131 Me., 4, 158 A., 362, 364, the accident happened at night, and our Court said that this fact furnished no excuse.

"A greater degree of precaution must be exercised when darkness throws a mantle over vision."

The Court also called attention to the fact that the plaintiff appeared to have been heedless of admonitory signs and that "He could not abandon circumspection, and, injury befalling him, charge his delinquency to the railroad."

A further observation of this Court is pertinent to the present situation:

"It is unmistakably apparent that conduct on the part of the plaintiff, without which the accident would not have happened, fell short of that of the typically prudent man, alert for safety. Both authority and common sense bar him from recovery. Plaintiff was rightly condemned of negligence, as a matter of law. No legal principle compels a judge to allow a jury to render a merely idle verdict."

EXCEPTIONS TO EXCLUSION OF EVIDENCE.

Consideration will be given to evidence excluded, although exceptions relating thereto were not seasonably filed, were not assented to by counsel for the defendant, and received only the qualified endorsement of the presiding justice "Allowed, if allowable." The exceptions were argued on both sides, and doubt as to their regularity may be regarded as waived.

Counsel for the plaintiff asked a physician, who testified concerning her injuries, "Have you knowledge of other accidents that occurred at this crossing prior to the Johnson accident?"

The train conductor was asked, in cross-examination: "At any of these crossings, these so-called blind crossings, are there lights and signals on both sides of the track?"

The same witness was asked in further cross-examination: "Isn't the removal of gates where there is no train man to tend them, isn't that a better protection?"

The foregoing questions were excluded and exceptions taken. Such testimony is clearly inadmissible under our evidentiary rules.

> "It is a well settled and familiar rule that in cases of negligence the evidence must be confined to the time and place and circumstances of the injury." *Damren* v. *Trask,* 102 Me., 39. See also 52 C. J., Railroads, §1991.

As to the first and second questions in particular, we find in *Parker* v. *Pub. Co.*, 69 Me., 173, the following:

> "Such evidence tends to draw away the minds of the jury from the point in issue, and to excite prejudice and mislead them; and, moreover, the adverse party, having no notice of such a course of evidence, is not prepared to rebut it."

Further,

> "If evidence of this character is receivable contradic-
> tory proofs would be admissible, and there would be
> as many collateral issues as there were collateral facts
> and witnesses testifying to them."

Again, as to the third question, it was not germane to the facts here existent. As before noted, the plaintiff had testi-fied that she saw no gates and no admonitory signals. Again, the railroad was required by the order of the P. U. C. to use gates at certain times during the day and not to use them at other times, and cannot be charged with negligence for its compliance with such order.

The plaintiff, at the close of the defendant's case, made an offer to produce a witness who, it was said, would testify that in his opinion the method of protection at the cross-ing was not adequate. This proffer was rejected and the evi-dence excluded.

There is plausibility to the contention that the opinion of an expert witness on scientific matters may tend to enlighten the minds of the jury as to things not within their ken. Such opinions may, in the discretion of the presiding Justice, be admitted.

When the facts and rules of law applicable thereto are plain, they do not require expert opinions which may lead to an exposition of methods that would transcend the legal duty of the defendant and so becloud rather than illuminate the issue. Here the circumstances and conditions were such that men of ordinary experience and intelligence might be presumed capable of drawing conclusions from evidence of eye witnesses without the assistance of expert testimony. The issue here was whether, as a fact, the admonitory signals were sufficient to warn a traveler exercising due care for his own protection. Such traveler is not entitled to have such

measures taken or devices used as would save him from the consequences of his own negligence.

In *State* v. *Watson,* 65 Me., 74, the Court quoted as the rule, that

> "The only cases in which opinion is evidence are those where the nature of the question involved is such that the jury are incompetent to draw their own conclusions from the facts without the aid of persons possessing peculiar skill and knowledge respecting such facts."

See also *Conley* v. *Gas Light Co.,* 99 Me., 57, 58 A., 61.

Of the same general character was the request of counsel for the plaintiff to introduce a subsequent supplemental order of the Public Utilities Commission, directing a change in the safety devices, by the elimination of gates and the installation of an additional automatic flasher light signal. Under the rules stated with reference to the first three exceptions, such evidence was likewise inadmissible.

*All exceptions overruled.*