**Charles R. GINN and Lois Ginn**

**v.**

**PENOBSCOT COMPANY.**

Supreme Judicial Court of Maine.

March 5, 1975.

Gross, Minsky, Mogul & Singal by Jules L. Mogul, Bangor, for plaintiffs.

Rudman, Rudman & Carter by Gene Carter, John M. Wallach, Bangor, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Chief Justice.

The defendant, Penobscot Company, appeals from a judgment obtained in the Superior Court (Penobscot County) on account of personal injuries suffered by Charles R. Ginn (plaintiff) and for consequential damages flowing therefrom, the corporate appellant claiming reversible error in the denial of its motion for judgment n. o. v. and for a new trial, as well as for other alleged trial mistakes.

The accident happened on June 8, 1970. The plaintiff husband, Charles R. Ginn, was then a healthy and rugged self-employed woods operator engaged in cutting, transporting and selling pulp wood as an independent business operation. Ginn was 40 years of age at the time of the accident and 42 at the time of trial. The parties stipulated that the life expectancy of the average American male at age 42 was 29.7 years while his work expectancy was 25 years. As a result of the injuries received, Mr. Ginn is an invalid, dependent on others for the performance of the most basic human tasks. The jury returned a verdict for the plaintiffs in the amount of $458,611.01 and the defendant appeals from the ensuing judgment.

The evidence discloses that the accident which led to Mr. Ginn's present condition took place in the wood yard of the defendant Penobscot Company. On June 8, 1970 in the afternoon Mr. Ginn drove in the yard with his truck carrying a load of pulpwood cut up in lengths of four feet and bound together in tiers by cables. The tiers were held on the body of the truck by stakes which, in turn, were linked together to keep the wood load in place. Stopping at the "scaler's shack" to get a measure of his load, Mr. Ginn then proceeded to park his truck near the defendant's wood pile at a spot marked for unloading vehicles. The defendant's authorized agent had selected the unloading zone which Mr. Ginn was obliged to use if he wanted his truck to be unloaded.

The unloading process, as was the usual custom, required Mr. Ginn to get out of the cab of his truck and climb upon his load. In assisting the defendant's crane operator, Mr. Ginn would unfasten the binder which held a tier of wood onto the truck and attach the crane cables to the cables which bound the tier of wood together. Upon a signal from Mr. Ginn, the crane operator would swing the tier off the truck and convey it to the point on the wood pile where he wanted the pulp to drop. When dropped on the pile, the cables holding the tier of wood together would loosen and the logs would fall out onto the pile. While the wood was being taken away to be dumped by the crane operator, Mr. Ginn would turn his attention

to the next tier to be unloaded. With his back to the wood pile, he would unfasten the binder on the next tier of logs in preparation for the return of the crane cables.

On the date of the accident, this process was followed and the first two tiers of wood from Mr. Ginn's truck were unloaded without incident. The third tier was attached to the crane cables in like manner and was lifted towards the pile. Mr. Ginn testified that he observed the crane drop the load on the pile, but, when the cables were raised up after the drop, one log remained teetering on them. He further testified that this was not an unusual occurrence in the wood lot and that, generally, when a log remained on the sling, the crane operator would merely drop the cables a second time to dislodge the remaining piece of timber.

Testimony establishes that, at this point, Mr. Ginn turned away from the wood pile toward the fourth and remaining tier of logs. His purpose in doing so was to release the final set of binders which held the tier on the truck. At this point, Mr. Ginn testified, he was suddenly struck from behind by a great force and driven against the fourth tier. He further stated that, after this impact and while lying in the bed of the truck, the crane cables were dropped upon his chest. (This latter testimony was disputed by the defendant).

I

The first issue we must consider is the applicability of the doctrine of res ipsa loquitur. The defendant contends that the trial Court erred in instructing the jury that it could apply the doctrine in the instant case. Beyond this threshold allegation of error, the defendant further maintains that, even if this was not error, the presiding Justice, nevertheless, erred in failing to instruct the jury that, in order to so apply the doctrine, they must first have found that the instrumentality causing the plaintiff's injuries was under the exclusive management and control of the defendant.

We will treat these two contentions together.

We have defined the doctrine in the following manner:

"The maxim of *res ipsa loquitur*, 'the thing itself speaks,' might, in practice, be translated, 'the accident spells negligence.' It does not dispense with the requirement that the one who alleges negligence must prove it. It is a rule of evidence that relates to the mode of proof. It is applicable, where there has been an unexplained accident, and the instrument that caused the injury was under the management or control of the defendant, and in the ordinary course of events the accident would not have happened if the defendant had used due care." Stodder v. Coca-Cola Bottling Plants, Inc., 1946, 142 Me. 139, at 142, 48 A.2d 622, at 624.

See also Corbett v. Curtis, Me., 1967, 225 A.2d 402; Cratty v. Samuel Aceto & Co., 1955, 151 Me. 126, 116 A.2d 623.

In considering the propriety of the use of the doctrine in this case, we will first determine whether the accident is unexplained as required under the rule. The evidence does support a finding that the plaintiff was struck on the back by an object with that degree of potency which he describes in his testimony as a "tremendous force." By reason of the accident he suffered great physical pain and extensive loss of normal body functions. The facts of this case present a situation analogous to that in Nichols v. Kobratz, 1942, 139 Me. 258, 29 A.2d 161. In *Nichols,* this Court held that the doctrine of res ipsa loquitur was appropriately applied, where a customer in a meat store was struck by a meat hook which rolled out of a refrigerator and into the store. There was no evidence which explained the cause of the occurrence. We do conclude as we did in *Nichols* that the accident here in question is of such an unexplained character as to satisfy the first element of the maxim res ipsa loquitur.

■ While it has been established that the accident happened and, as has been stated, is of an unexplained nature, the mere fact that the accident occurred does not determine whether *res ipsa loquitur* may be applied. "The character of the accident, rather than the fact of the accident, decides, as a legal proposition, whether the doctrine applies." Chaisson v. Williams, 1931, 130 Me. 341, 347, 156 A. 154, 157; see also Duchaine v. Fortin, 1963, 159 Me. 313, 192 A.2d 473.

■■ When we refer to the "character of the accident," we mean that quality of the occurrence which gives rise to the inference that such an event would not have taken place but for the presence of some one's negligence. It is not enough that the accident merely be unusual or its cause unknown. It is the manner in which the accident occurred and the attending circumstances which determine whether res ipsa loquitur is an appropriate device. Capps v. American Airlines, 1956, 81 Ariz. 232, 303 P.2d 717.

■ We believe that here there is more than just an unusual accident. Under the totality of the circumstances established by the evidence at trial, the *character* of the occurrence was such that it gave rise to a permissible inference of negligence as an underlying cause. The testimony of Joseph Butera, the operator of the crane, justified the conclusion that there was no apparent mechanical defect in his machine and that, on the date of the accident, it was operating normally. Coupled with the circumstance that Mr. Ginn testified to the presence in the cables of one log which remained unreleased after the drop of the third tier and was teetering in the air shortly prior to the accident, the evidentiary record in this case satisfies us that the accident was of the "kind which does not, according to the common experience of mankind, occur if due care has been exercised."

As stated in J. & Jay, Inc. v. E. Perry Iron & Metal Co., Inc., 1965, 161 Me. 229, 210 A.2d 462:

"[D]amage does not ordinarily flow from the shifting or dropping of a load in the operation of a crane in the absence of negligence."

## II

■ The presiding Justice instructed the jury that, as a prerequisite to the application of the res ipsa loquitur rule, the plaintiff had to prove the instrumentality causing the injury was under the management or control of the defendant. It is claimed that such instruction was inadequate and effected reversible error by failing to phrase this aspect of the rule in terms of "exclusive control" of the injury-causing instrumentality. We disagree.

In Corbett v. Curtis, Me., 1967, 225 A.2d 402, at page 406, upon consideration of this very issue, this Court decided that, in the application of the maxim of res ipsa loquitur in Maine, the preferable test is whether the instrument causing the injury was "under the management and control" of the defendant as against under his "exclusive" control. Thus, the jury instruction was proper.

Furthermore, the presiding Justice elaborated on this aspect of his charge, as follows:

"[B]y a preponderance of the evidence, you must be able to eliminate as responsible causes, causing causes, the conduct of the plaintiff and/or third persons. In other words, putting it in a very general way is, the incident itself must not only speak negligence, but you must, by evidence, remove the negligence of the plaintiff or a third party having caused it before you can infer negligence against the defendant, which is only logical. To infer evidence [negligence] against one party without removing it from another party would certainly not be accepted. So, we have that rule."

In so doing, the Justice was directing the jury's attention to the rationale underlying the basic test of control of the instrumentality causing the injury which the maxim implies.

The Restatement of the Law (Second) of Torts, 1965, § 328D defines the doctrine of res ipsa loquitur in this fashion:

"(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) *other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence;* and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." (Emphasis added).

The exclusion of other responsible causes (other than the defendant's negligence) to permit under the maxim the inference of negligence against the defendant having control of the instrumentality alleged to have caused the injury was approved in Black v. Goodrich, Me., 1968, 237 A.2d 148, at 149. Viewing the charge in its totality, we hold that the defendant was in no way prejudiced and that res ipsa loquitur did apply.

## III

It is further contended that the application of the maxim res ipsa loquitur in the instant case violated the rule that a party having the burden of proof cannot rest his proof of an ultimate fact on an inference the probative value of which in turn depends upon another inference. "A conclusion reached by drawing inferences from inferences [it is said] is never considered as being probative of an ultimate fact under any proper concept of judicial proof." Industrial National Bank v. Dyer, 96 R.I. 39, 45, 188 A.2d 909, 913. See also, Waldman v. Shipyard Marina, Inc., 1967, 102 R.I. 366, 230 A.2d 841.

Our Court has not adopted such a specific rule against the pyramiding of inferences. Instead, it has indicated the legal sphere within which inferences may legally operate.

The long standing rule in Maine has been stated many times. When it is sought to establish a case by inferences drawn from facts, such inferences must be drawn from facts proven, and cannot be based upon mere probabilities. Inferences based on mere conjecture or probabilities will not support a verdict. Duchaine v. Fortin, 1963, 159 Me. 313, 318, 192 A.2d 473, 476; Olsen v. Portland Water District, 1954, 150 Me. 139, 144, 107 A.2d 480, 483; Bechard v. Lake, 1940, 136 Me. 385, 391, 11 A.2d 267, 270; Eddy v. Bangor Furniture Co., 1936, 134 Me. 168, 172, 183 A. 413; Eastport Water Company v. E. A. Holmes Packing Company, 1922, 121 Me. 345, 117 A. 311; Bennett v. Thurston, 1921, 120 Me. 368, 114 A. 459.

In Manchester v. Dugan, Me., 1968, 247 A.2d 827 at page 829, however, we said:

"An inference is a deduction as to existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts. *An inference must be based on probability and not on mere possibilities or on surmise or conjecture and must be drawn reasonably and supported by the facts upon which it rests."* (Emphasis ours).

See also Cogswell v. Warren Brothers Road Co., Me., 1967, 229 A.2d 215 at page 221.

But this statement must viewed as consistent with existing law. True, it emphasizes the fact that an inference operates in a setting of probabilities as opposed to conjectures, surmises or mere possibilities, but, at the same time, it requires that it find reasonable support on proven facts. That the Court did not intend any deviation from previous holdings may be gleaned from its stated conclusion:

"The fact remains, however, that the jury was not entitled to guess or surmise *but could draw its inferences only from*

*proven facts."* (Emphasis supplementary).

Our Court has further circumscribed the drawing of inferences to support an ultimate fact by means of an alternate rule to the following effect:

"Where different inferences are deducible from the same facts and are equally consistent with those facts, it cannot be said that the plaintiff has maintained the proposition on which alone there can be recovery." Mills v. Richardson, 1927, 126 Me. 244, 250, 137 A. 689, 692. See also Mosher v. Smithfield, 1892, 84 Me. 334, 337, 24 A. 876.

In Hersum, Admr. v. Kennebec Water District, 1955, 151 Me. 256, 263, 117 A.2d 334, 338, 53 A.L.R.2d 1072, this Court had this to say:

"We have recently had occasion to call attention to the basic differences between surmise and conjecture on the one hand and reasonable inferences upon the other. Referees, like juries, may not base their conclusions on guess or speculation, but they are entitled to draw reasonable inferences from the evidence, and *findings will not be upset if the evidence is such as to justify a reasonable belief of the probability of the existence of the material facts.* Thompson v. Frankus, 151 Me. 54, 115 A.2d 718; White v. Herbst, 128 Conn. 659, 25 A.2d 68. *Where there are several possible theories to explain the happening of an event, the evidence must be such as to have selective application as to the one adopted by the fact finder.* Jordan v. Portland Coach Co., 150 Me. 149, 107 A.2d 416; Suburban Electric Co. v. Nugent, 58 N. J.L. 658, 34 A. 1069. In the absence of direct evidence of an element of causation, a reasonable inference may be drawn under some circumstances from what subsequently occurred. Hatch v. Globe Laundry Co., 132 Me. 379, 171 A. 387. *Reasonable inferences may be drawn only when they logically flow from the testimony and from physical*

*facts duly proven to have existed.* Cooper & Co. v. American Can Co., 130 Me. 76, 153 A. 889. The fact finder must ask himself whether one of several possible theories is more rational, logical and probable than the others. *If, when examined in the light of the known facts, two or more theories remain equally probable and equally consistent with the evidence, the selection of one to the exclusion of others would rest upon mere surmise and conjecture."* (Emphasis supplied).

In Metrinko v. Witherell, 1936, 134 Me. 483, 486, 188 A. 213, 214, our Court said that

*"res ipsa loquitur* is a rule of evidence which, where applicable, permits the inference of negligence from circumstantial facts.

In dealing with inferences, the jury is at liberty to find the ultimate fact one way or the other, as it may be impressed by the evidence and legitimate deductions."

The *Hersum* guidelines indicate that the fact finder could never draw an inference from another inference that is itself speculative or merely of remote possibility, or which did not exclude the drawing from the same facts on which it rests of a different equally reasonable and probable inference.

In the instant case, the *Hersum* requirements have been fully met. The evidence justified a reasonable belief by the jury of the probability of the existence of all material facts necessary to support the deduction of all inferences which had to be made to reach the ultimate result that the plaintiff's injuries were caused by the defendant's negligence. From the totality of the evidence which it had the right to believe, the jury could rationally conclude that the sole logical and probable cause of the plaintiff's injuries was the defendant's negligence in allowing a piece of pulp wood to remain in the crane cables, be carried back to the plaintiff's truck and

dislodged with great force upon the plaintiff who at the time, in the exercise of due care, was readying the last tier of wood to complete the unloading process. The jury was justified in finding from the evidence that all other possible inferences were necessarily excluded. In so doing, we cannot say that there was error as a matter of law.

## IV

The defendant next assigns as error several aspects of the trial Court's instructions to the jury relating to the application of our Comparative Negligence statute, 14 M.R.S.A., § 156. However, the record reveals that the defendant at trial made no objections to the charge of the presiding Justice in so far as it dealt with the reference statute. In raising his objections for the first time when he filed his points on appeal, long after the entry of judgment, the defendant is in violation of Rule 51(b), M.R.C.P.

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

In Wescott v. Vickerson, Me., 1971, 284 A.2d 902, we emphasized the need for strict compliance with the rule:

"[It] embodies a strong policy, necessary for the sound and efficient administration of justice, that parties may not await the outcome of a case to assert alleged reversible error based on court instructions, or omissions to instruct, which the presiding Justice could have been afforded opportunity to avoid had the alleged error been called to his attention at a time when he was in position to make appropriate correction." Id. at 904.

■ A new trial will not be granted to a party who has failed to make timely objection to the charge of the presiding Justice to the jury, whether on the ground his instructions were erroneous or merely inadequate in law, unless the error has deprived him of the fair trial to which he is legally entitled and has resulted in injustice. On several occasions this Court has, in the interest of justice, recognized such an exception in appellate review of asserted grievances in jury instructions. See Crocker v. Coombs, Me., 1974, 328 A.2d 389; Wing v. Morse, Me., 1973, 300 A.2d 491, 502; Wescott v. Vickerson, supra; Neal v. Bowes, 1963, 159 Me. 162, 189 A.2d 566.

The defendant complains that the presiding Justice's charge did not convey to the jury the separate and distinct concepts of "fault" upon which the Comparative Negligence statute, as interpreted by this Court in Wing v. Morse, supra, bottoms, first, the question of liability and, secondly, the question of apportionment of responsibility for the resulting damage. We realize that the presiding Justice in the instant case did not have the benefit of the *Wing* decision at the time of trial. However, the instructions given on this phase of the trial do not parallel the situation with which this Court was confronted in Wing v. Morse. Indeed, the charge fairly reflected the statutory dual concept, even though not given in the technical terms suggested by Wing v. Morse.

"If the instructions are substantially correct, and the legal situation was apparently made clear to the jurors, it is sufficient. . . . When the jury has been properly instructed on a certain principle, the amplification or application of it is in the discretion of the presiding justice." Desmond, Pro Ami v. Wilson, 1948, 143 Me. 262, 267, 60 A.2d 782, 785.

■ The defendant's complaint that the Court below erroneously placed upon it the burden of proof respecting the causal contributory negligence of the plaintiff in this tort action was resolved adversely to the defendant's standpoint by Crocker v. Coombs, supra, and needs no further discussion.

## V

The next point on appeal deals with the admissibility of evidence. In apparent rebuttal to the plaintiff's testimony on earning capacity, the defendant called one Lawrence E. Parker, Jr., a certified public accountant, whose qualifications as an expert in that field were conceded. Advising the Court that, if permitted to testify, the witness would state that his analysis of the plaintiff's income tax returns for four years prior to the accident would show a profit slightly over $2,200 in one year and annual losses in the other years, the defendant's attorney then asked the witness, to what schedule C of the tax returns related and whether the particular returns showed a profit or loss. Answers to these questions were excluded on objection, on the ground that the returns "speak for themselves" and are not subject to "interpretation" by experts.

■ The testimony of experts is rightly excluded when the subject of inquiry is one which is plainly comprehensible by the jury and of such a nature that unskilled persons would be capable of forming correct conclusions respecting it 'without the opinion of experts. Mayhew v. Sullivan Mining Co., 1884, 76 Me. 100.

■ In Pulsifer v. Berry, 1895, 87 Me. 405, 408, 32 A. 986, 988, this Court quoted with approval the following language:

"The jurors may have less skill and experience than the witnesses and yet have enough to draw their own conclusions, and do justice between the parties. Where the facts can be placed before a jury, and they are of such a nature that jurors generally are just as competent to form opinions in reference to them and draw inferences from them, as witnesses, then there is no occasion to resort to expert or opinion evidence."

Schedule C of form 1040 is clearly headed "Profit (or Loss) from Business or Profession." The bottom line of the form distinctly indicates whether a profit or loss

is reported by the taxpayer. The tendered "expert" testimony would have added nothing to the jury's understanding of these returns. There was no error in excluding the witness's prospective reading or explanation of the documents. See also Johnson v. Maine Central Railroad Co., 1944, 141 Me. 38, 46, 38 A.2d 884, 888; Lee v. Meyer, 1 Cir., 1971, 439 F.2d 263.

## VI

### A. Mrs. Ginn's nursing services

■ In Count IV of the complaint, Lois Ginn, the wife of Charles R. Ginn, the party physically injured in the accident, sought to recover for her own consequential damages in the nature of loss of consortium and earnings. We take notice that the Court submitted to the jury, with the apparent suggestion of counsel for the plaintiffs and the defendant, written interrogatories pursuant to Rule 49(a), M.R.C. P. The interrogatory relating to the plaintiffs' damages and the answer thereto were worded in the unitary concept of a single amount for both parties plaintiff:

(4) "What do you find to be the total damages of Plaintiffs, Charles R. Ginn and Lois Ginn? *four hundred fifty-eight thousand, six hundred eleven dollars and one cent.*"

The defendant raised no objection at trial to the form of the special verdict, nor does it complain specifically in this appeal about the blending of the husband's and the wife's recovery into one monetary assessment.

The defendant, however, now assigns as error the Court's instruction to the jury concerning the plaintiffs' right to recover for the value of the nursing services rendered by Mrs. Ginn to her husband after the accident. The presiding Justice instructed the jury that Mrs. Ginn could recover in the alternative, either the value of her services as her husband's nurse or her loss of earnings, but not both.

At side bar counsel for the plaintiffs pointed out to the Court in relation to the given charge:

"I was a little bit worried about this nursing service thing because they [the jury] should be told, I think, that he [meaning the plaintiff husband] is entitled to reasonable cost of nursing services as such, if such services are sought elsewhere other than his wife's, because all you talked about was his wife."

To this attempt by the plaintiffs' counsel to have the charge clarified or corrected, the defendant's counsel replied:

"I think that was covered."

It would appear that the plaintiffs' counsel was relying, for his stated suggestion, upon Britton v. Dube, 1958, 154 Me. 319, 147 A.2d 452 and Johnson v. Rhuda, 1960, 156 Me. 370, 164 A.2d 675. At any rate, in the posture in which the trial record presents this point on appeal, we decline to entertain it. Since counsel for the defendant did not raise an objection when there was opportunity to do so and in fact conveyed to the presiding Justice that, with respect to the subject matter under discussion, he was satisfied the instructions given were substantially and accurately stating the law, he cannot now complain. M. R.C.P., Rule 51(b); International Paper Co. v. State, Me., 1968, 248 A.2d 749, at 753–754. Furthermore, the suggested integrated special interrogatory on damages does indicate that this stated grievance is an afterthought in an area in which no injustice has resulted to the defendant by reason thereof.

B. *Reduction of the damage award to present worth*

The defendant complains that the Justice below erred in his instructions to the jury regarding the reduction of the damage award to its present worth. It is alleged the Court's charge was misleading in that it could be interpreted as giving the jury an option to reduce or not reduce the gross amount of the verdict. Stated otherwise,

the defendant's complaint is that the Justice erroneously failed to give a specific instruction on the mandatory aspect of the reduction upon request.

It is clear that the measure of damages to which a plaintiff is entitled for the loss of future earning capacity is "a sum equal to the present worth of . . . [the] diminution [in his future earnings] and not its aggregate for his expectancy of life." O'Brien v. J. G. White and Company, 1909, 105 Me. 308, 316, 74 A. 721, 724.

As pointed out in Steppi v. Stromwasser, Del.Supr., 1972, 297 A.2d 26:

"Because of the capacity of money to earn money, the authorities are almost unanimous in holding an award for loss of future earnings must represent the present value of those earnings. By the award, the plaintiff immediately receives money which he would otherwise have received periodically over the span of years. Failure to recognize this fact by discounting the anticipated earnings would therefore constitute error."

See also 25 C.J.S. Damages, § 87e; 22 Am.Jur.2d Damages, § 96.

While the instructions originally given by the presiding Justice appear at best confusing and at worst inadequate, we cannot say that there was error in the supplemental instruction given to the jury after counsel had raised objections at side bar. The Court then sufficiently indicated the necessity to reduce to present worth the damages awarded for loss of future earning capacity.

With respect to the reduction of the loss of future earnings to present worth, the parties at trial stipulated "that the jury should be instructed to consider 5½% a reasonable average rate of return in computing present value of any award for future damages." The defendant charges error, because the Justice below in his instructions to the jury characterized the stipulated rate as advisory in nature and

not of binding effect upon them. Not only was there no objection to the charge on this subject, but at side bar the defendant's counsel endorsed the instruction as given, when he stated:

> "[We] maintain that it is mandatory that in making such award of future damages, *that it is to be reduced to present value by what ever standards the jury may deem to be appropriate*." (Emphasis added).

In the face of such trial record, it is imperative that the strong policy considerations underlying the rationale of Rule 51(b), M.R.C.P. be fully operative.

### VII

A. *Evidence of Mr. Ginn's earning capacity*

On direct examination, Mr. Ginn was asked the following question:

> "Assume that you are in the same physical condition that you were in just prior to the accident of June 8, 1970, and then tell us what you could earn yarding and cutting."

The defendant's objection was overruled and the plaintiff answered: "I figure $12,000 a year." Contrary to the defendant's contention that "no foundation was developed to allow an analysis or evaluation of the underlying basis of the [plaintiff's] opinion," the Justice concluded that the witness Ginn could express such an opinion as to the worth of his services because of his background and experience, subject to further probing as to weight through the process of cross-examination.

In Holmes v. Halde, 1882, 74 Me. 28, at 39, this Court stated:

> "If, by the injuries received, the plaintiff was deprived of his capacity to perform his ordinary labor, or attend to his ordinary business, the loss he sustained thereby is an element of damages. The true test is what his services might be worth to him in his ordinary employment

or business. It is not what sum he might legally recover for such services, but what he might fairly be expected to receive therefor."

Thus, the issue on that aspect of the evidence was, what might the plaintiff fairly expect to receive for his work as a cutter and yarder? Such evidence would indirectly be relevant to the ultimate issue of his business loss.

In Goldstein v. Sklar, Me., 1966, 216 A. 2d 298, we looked with favor upon this indirect way of proof of loss in the plaintiff's medical practice by a showing of his loss of earning capacity:

> "Direct and specific evidence of the extent of the impairment [of earning capacity], measured in money, is not necessary; it is not essential to recovery of damages for permanent disability that there be in the evidence for purposes of comparison proof of income before and after the accident in support of diminution of earning power." Id. at 309 and cases cited.

Such indirect proof of loss in a business operation may be furnished by proof of the market value of the plaintiff's services. Where the plaintiff's services were rendered in the prosecution of a business of which he was the sole owner, the value of his earning power may be the measure of the value of the services he contributed to the business, and the damages for loss of earning capacity in turn may be determined by the market value or commonly paid compensation for similar services in businesses of like nature. Lashin v. Corcoran, 1959, 146 Conn. 512, 152 A.2d 639.

Again, in Baxter v. Philadelphia & R. Ry. Co., 1919, 264 Pa. 467, 107 A. 881, the Pennsylvania Supreme Court held that, in a wrongful death action, where plaintiff's decedent was engaged in a business, it was permissible, in proof of the value of the decedent's services to his business, to show the nature and extent of the business,

the nature and extent of the injured person's contribution to it, and "what the services were worth, if employed under like circumstances by another in a similar capacity." Id., 107 A. at 884. Cf. Melford v. S. V. Rossi Construction Company, Inc., 1973, 131 Vt. 219, 303 A.2d 146.

The plaintiff's testimony was not an approximation of his ultimate loss. It was not a direct expression of his earning capacity. It was a statement of the market value of his services and as such could be considered by the jury as *bearing* upon the plaintiff's ability to earn a living. Such an expression was open to attack. The defendant could have cross-examined the witness in an attempt to discredit the plaintiff's statement and he could have introduced witnesses in contradiction. Mr. Ginn was a man of considerable experience in his trade and, based upon his experience, he was competent to express an opinion on the market value of his services. "The jury could . . . find . . . that his estimates of loss were not pure fiction or fantasy but were factually grounded." Goldstein v. Sklar, supra, 216 A.2d at 309. [1]

B. *Business profits expectancy five years from accident*

On redirect examination, the plaintiff was asked:

"[H]ow much do you feel that you could earn working in your business five years, approximately five years after June 8, 1970, had your business been able to continue running? . . . Assuming you weren't hurt?"

Over objection, Mr. Ginn stated:

"I figured the way my business was getting along, I could earn up to $20,000 a year with my equipment and stuff."

The defendant had articulated his objection on two grounds, 1) the plaintiff was attempting to prove loss of future earning capacity by proving loss of future business profits and 2) the question called for testimony in the realm of pure speculation by the witness on matters nowhere to be found in the evidence.

It is unnecessary to belabor the first ground of objection except to say that under certain circumstances lost profits may be admitted as evidence of earning capacity. These circumstances are limited to those in which the individual's contribution to the enterprize is the substantial income producing factor rather than the investment of capital or the labor of others. See 22 Am.Jur.2d Damages, § 95 and 45 A.L.R. 3d 345. We believe that the charge given by the presiding Justice sufficiently clarified the difference between the income of the business and the plaintiff's contribution to that business when used in connection with proof of earning capacity.

The defendant's second ground for objection, however, is well taken. The plaintiff's assertion that he "could earn up to $20,000 a year with my equipment and stuff" "the way my business was getting along" within five years after June 8, 1970, the date of the accident, was completely unsupported by any evidence and utter speculation. As a matter of fact, the specific evidence on the subject showed business losses for three years prior to the injury date.

---

1. Assuming this portion of Mr. Ginn's testimony to have been erroneously admitted, we are of the opinion that the error would be harmless. The jury had before it the testimony of Edmund J. Nolette, which ultimately was received without objection. Mr. Nolette, a man of considerable experience in the lumber trade, testified regarding the plaintiff's ability to earn a living in the lumber market, had he not been injured, that the plaintiff's earning capacity on an individual or private basis would be between $200 and $250 per week. In light of the testimony of Mr. Nolette, which the defendant concedes was properly before the fact-finder, the testimony of Mr. Ginn becomes merely cumulative. Therefore, if there was any error in the reception of such testimony, its impact on the outcome was negligible and thus harmless.

Where an established business has been interrupted by reason of a tortious injury to the operator, a resulting loss of prospective profits may become the basis of a recovery, provided there be evidence of past experience or from persons with expertise in the field sufficient to render the extent of such loss reasonably certain and fairly susceptible of proof. See Bogart v. Pitchless Lumber Co., 1913, 72 Wash. 417, 130 P. 490; Webster v. Beau, 1914, 77 Wash. 444, 137 P. 1013, 51 L.R.A., N.S., 81. In Pierce v. Seattle Electric Co., 1915, 83 Wash. 141, 145 P. 228, the plaintiff was permitted to testify that she had conducted a hairdressing establishment for some four years in the past, that prior to her injury, she intended to go into that business, that the opportunities for that type of business were very good. In disposing of the claimed error, the Washington Court said:

"The evidence was competent as tending to show a loss of earning capacity, and, as no specific statement was made of any specific amount of anticipated profits which plaintiff claimed she had lost, we fail to understand how the defendant was injured or prejudiced."

Prospective profits are allowable only if they can be estimated with reasonable certainty. The plaintiff's opinion that, after the operation of his business for five years, had he not been injured, he would have earned $20,000 per year, was mere guesswork and conjecture. Opinion evidence to be admissible must be informed opinion. The jury cannot be expected to weigh such evidence in proper perspective, unless they have before them not only the opinion, but the facts which give rise to the opinion. In the instant case, we have nothing more than the plaintiff's bald assertion of future anticipated profits. To admit such evidence without a proper foundation was error.

In speaking of opinion testimony, this Court has stated:

"The opinion, if not based upon his own firsthand observation, should at least be grounded upon facts supplied by others for which there is support in the evidence. Unless the factual foundation which underlies the opinion is known and subject to the test of cross-examination, it is virtually impossible to conduct intelligent and effective cross-examination as to the opinion itself." Brouillette v. Weymouth Shoe Company, 1961, 157 Me. 143, 170 A.2d 412, 413.

See also Kittery Electric Light Co. v. Assessors of the Town of Kittery, Me., 1966, 219 A.2d 728, 742; Warren v. Waterville Urban Renewal Authority, Me., 1967, 235 A.2d 295, 298; Parker v. Hohman, Me., 1969, 250 A.2d 698, 702.

In the present case, the defendant was prejudiced by such evidence of anticipated business profits, since it provided the jury with an additional enlarged aspect of damage which was not grounded on established fact but rested wholly upon surmise and conjecture. Viewing the case in its entirety, we do not believe that this specific error tainted in any way the jury's verdict on liability, which has ample support in the evidence. We cannot say, however, that the testimony of Charles R. Ginn relating to his future earning capacity from the operation of his business "up to $20,000 a year," had he not been injured, did not materially prejudice the defendant.

The entry will be

If the plaintiffs remit all of the judgment in excess of three hundred eighty-three thousand six hundred eleven dollars and one cent within 30 days after the rescript in this case is received, the appeal is denied; otherwise the appeal is sustained and a new trial on the issue of damages only is granted.

All Justices concurring.