1999 ME 65

**Jewell KOPENGA**

v.

**DAVRIC MAINE CORPORATION**

Supreme Judicial Court of Maine.

Argued March 3, 1999.
Decided April 27, 1999.

---

William C. Nugent (orally), Portland, for plaintiff.

Edward S. MacColl (orally), F. Jay Meyer, Thompson, Bull, Furey, Bass & MacColl, LLC, Portland, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Davric Maine Corporation appeals from a judgment of the Superior Court (Cumberland County, *Mills, J.*) finding liability and awarding damages on Jewell Kopenga's claim for sex discrimination pursuant to Title VII of the Federal Civil Rights Act, 42 U.S.C.A. § 1981a (1994), and the Maine Human Rights Act, 5 M .R.S.A. § 4613(2)(B) (Pamph.1998). On appeal, Davric does not contest the sex discrimination finding, but challenges the damage awards for lost wages, general compensatory damages and punitive damages. We affirm the lost wages and compensatory damages awards but vacate the award of punitive damages.

## I. CASE HISTORY

[¶ 2] Davric is the operating entity for Scarborough Downs, a harness racing track located in Scarborough. Kopenga was employed on the security staff at Scarborough Downs from March to November of 1995. She had previously worked as a security

officer at the race track in the early 1980's. Additionally, she had a bachelor's degree in criminal justice and experience in security work with the Cumberland County Sheriff's Office and the Maine Correctional Center.

[¶ 3] When Kopenga interviewed to work at Scarborough Downs in 1995, William Duffy, the Director of Security, told Kopenga that he did not ordinarily hire women. Kopenga began in March and worked primarily in the dispatch office, answering telephones and completing paper work. She earned six dollars per hour.

[¶ 4] Two significant assignments performed by security officers at the race track were the "sweeps" and the midnight shift at the "stable gate." The sweeps involved collecting money from cash generating venues at the race track. The stable gate is the entrance to the barns where the horses are kept and was regarded by some as rowdy in the late night hours.

[¶ 5] When Kopenga started at Scarborough Downs, the Deputy Chief of Security attempted to train her in how to conduct a sweep. However, Duffy interrupted the training and told Kopenga that he would not allow women to do sweeps.

[¶ 6] In order to work additional hours, Kopenga requested that she be assigned to work the midnight shift, particularly at the stable gate. Generally, Kopenga was denied these assignments because Duffy did not allow women to perform late night security at the stable gate. On one particular occasion, the Budweiser Clydesdales came to Scarborough Downs for two weeks. Kopenga asked if she could work an additional eighty hours at the stable gates during those two weeks. Again her request was rebuffed because of her gender.

[¶ 7] When Kelly Foster, the general manager at Scarborough Downs later learned of Duffy's actions, she met with Duffy, advised him that his actions were in violation of company policy and directed him to change the discriminatory practices.

[¶ 8] Ultimately, Kopenga left Scarborough Downs because of disputes over her work assignments. She then commenced the present discrimination action pursuant to the Maine Human Rights Act and the Federal Civil Rights Act, initially presenting her claim to the Maine Human Rights Commission and then filing a complaint in the Superior Court.[1]

[¶ 9] After a bench trial, the Superior Court ruled in Kopenga's favor, finding discrimination and awarding damages of $5,404.50 for lost wages, $5000 for general compensatory damages and $5000 for punitive damages. In its findings, the court determined that Duffy's discriminatory policy was "intentional." In addition, the court found that "[t]he refusal by Scarborough Downs to allow [Kopenga]" to work the requested security assignments "was degrading and humiliating." Davric made no request for additional findings pursuant to M.R. Civ. P. 52 and filed this appeal.

[¶ 10] We review a trial court's findings of fact for clear error, upholding those findings if there is competent evidence in the record to support them. *See Maine Farmers Exch. v. McGillicuddy*, 1997 ME 153, ¶ 7, 697 A.2d 1266, 1269. When, as in this case, the appellant has not asked the court "to make formal findings of fact, we assume that the court found all facts necessary to support its holding." *See Williams v. Ubaldo*, 670 A.2d 913, 916 (Me.1996). With that background as the standard for review of the trial court's findings, we proceed to address Davric's contentions on appeal.

## II. BACK PAY

[¶ 11] We will uphold an award of back pay under the Maine Human Rights

---

1. If a plaintiff wants to avail herself of all opportunities for recovery under the Maine Human Rights Act, including attorney fees, compensatory damages and punitive damages, the plaintiff must first present the claim to the Maine Human Rights Commission, then, after action by the Commission, the party may bring a private action for discrimination in the Superior Court.

*See* 5 M.R.S.A. § 4622 (Pamph.1998). Plaintiff's original complaint was in five counts, but only the counts charging violations of the Maine Human Rights Act (Count I) and the Federal Civil Rights Act (Count II) and seeking punitive damages (Count V) were tried. Judgments on Counts III and IV of the complaint and on the counterclaim are not subject to this appeal.

Act "absent clear error by the grant of the award or an abuse of discretion in the amount awarded." *LeBlond v. Sentinel Serv.*, 635 A.2d 943, 945 (Me.1993); *see also* 5 M.R.S.A. § 4613(2)(B). There is no abuse of discretion when the court "awards back pay in amounts 'designed to make the employee whole and not to penalize the employer unless that penalty is authorized by statute.' " *Id.* (quoting *Rozanski v. A–P–A Transp. Inc.*, 512 A.2d 335, 342 (Me.1986)).

[¶ 12] The trial court determined that but for Duffy's practiced policy of gender discrimination, Kopenga could have worked sixteen additional hours per week for a period of thirty-three weeks and that she would have earned overtime for almost all of these hours. The court also concluded that Kopenga would have been able to work an additional eighty hours of overtime during the Clydesdale event.[2]

[¶ 13] Davric hotly contested Kopenga's claims of back pay, presenting evidence that Scarborough Downs' overtime budget was limited and that overtime was not permitted unless absolutely necessary. The record also included evidence that at least during the final eleven weeks of her employment (i) Kopenga worked as much or more overtime than any other Scarborough Downs security employee, and (ii) no security employee worked, or had the opportunity to work the hours of overtime that Kopenga asserted she could have worked but for the discrimination. Certainly, if one accepts the evidence from Scarborough Downs's point of view, it could support a finding that Kopenga lost little or no overtime pay opportunities because of gender discrimination. However, that is not our standard of review. *See LeBlond,* 635 A.2d at 945 (Court reviews an award of back pay for clear error, with the amount of the award subject to review for abuse of discretion).

[¶ 14] Kopenga presented evidence that (i) she took notice of the assignments of security positions; (ii) there were frequent vacancies on the midnight shift position; (iii) she was available to fill these vacancies; (iv) when she asked to fill these vacancies, her requests were denied because she was a woman; (iv) she had some responsibility for finding persons to fill these and other vacant positions; (v) Scarborough Downs could not fill the vacant positions; and (vi) supervisors were forced to work the midnight shift. The record also includes evidence that Kopenga herself had worked as many as eleven and one-half hours additional overtime in a particular week and that other employees did work overtime.

[¶ 15] At trial, Kopenga was asked to estimate how much overtime she would have been able to work but for Duffy's discriminatory policy. Based on her personal knowledge of the schedule, her own physical capacities and the needs of her co-workers, Kopenga estimated that she could have worked sixteen hours of overtime each week. In addition, when the Clydesdale show came to Scarborough Downs for two weeks, she requested to work eighty hours of overtime at the stable gate and her request was denied because of her gender.

■ [¶ 16] In light of this evidence, the trial court rationally could have concluded that overtime assignments, particularly the midnight shift, were regularly available, and that Kopenga could have and would have filled these positions and received the extra overtime she sought but for the gender discrimination. *See Bourette v. Dresser Indus., Inc.,* 481 A.2d 170, 174 (Me.1984) (holding a damage award will be affirmed unless "it is plain that there is no rational basis upon which the amount of the award may be supported."). Because the trial court's findings of fact on the availability of overtime are supported by competent evidence in the record, albeit disputed, we affirm the award of back pay. *See Maine Farmers Exch.,* 1997 ME 153, ¶ 7, 697 A.2d at 1269.

---

**2.** Pursuant to 26 M.R.S.A. § 664(3) (Supp.1998), "[a]n employer may not require an employee to work more than forty hours in any one week unless one and one-half times the regular hourly rate is paid for all hours actually worked in excess of forty hours in that week." Given that Kopenga earned six dollars per hour, the court awarded her nine dollars per hour for each hour of overtime denied because of her gender.

## III. COMPENSATORY DAMAGES

[¶ 17] In order to align Maine law with the Federal Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(1), the Legislature amended the Maine Human Rights Act in 1997 to provide for compensatory damages in cases of intentional employment discrimination. *See* P.L.1997, ch. 400, § 1 (codified at 5 M.R.S.A. § 4613(2)(B)(8)); L.D. 1713, Statement of Fact (118th Legis.1997). Because this action was also brought under Title VII, the Title VII damages provisions arguably apply concurrently with the 1997 damages provisions of the Maine Human Rights Act. Neither party raised any issue regarding application of the 1997 Maine Human Rights Act amendments to the actions in this case which occurred in 1995. *See Howe v. Natale*, 451 A.2d 1198, 1201 (Me.1982). Thus, any objection on this point is waived. *Id.*

[¶ 18] Davric asserts that the award of general compensatory damages is not supported by the evidence because Kopenga did not suffer serious emotional distress as a result of the discrimination. In making this point, Davric appears to argue that the standard for an award of general compensatory damages for emotional distress under section 4613(2)(B)(8)(e) should be the same as the restrictive standard for an award of damages under negligent infliction of emotional distress claims. *Cf. Gayer v. Bath Iron Works Corp.*, 687 A.2d 617, 622 (Me.1996) (NIED claim requires showing of serious emotional distress). In this argument, Davric misapprehends the application of the general compensatory damages provisions of the Maine Human Rights Act. Section 4613(2)(B)(8)(e) allows the court to award damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life [and] other nonpecuniary losses ...." In referring to "inconvenience" this statute plainly contemplates a much lower threshold for an awarding of damages. The language is similar to the low threshold of evidence for awarding damages under the pain, suffering, mental anguish and loss of enjoyment of life criteria of general tort actions. *Cf.* ALEXANDER, MAINE JURY INSTRUCTION MANUAL § 7–70 (3d ed.1998).

[¶ 19] In describing how Duffy's policy of gender discrimination impacted her emotionally, Kopenga testified,

I can't think of any other time in my life that I have ever felt more humiliated and degraded to have put in so many years in education, in training, in law enforcement, and then to walk into a security department and be told that I cannot do the jobs that I am not only fully qualified to do but better qualified than anyone there, including their own administration, based on my gender. I am sorry, it was very humiliating.

This testimony presented sufficient evidence of emotional distress as a result of the gender discrimination to support the trial court's findings and award of general compensatory damages. *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046–47 (5th Cir.1998) (upholding an award of compensatory damages where plaintiff testified that as a result of gender discrimination, she had suffered low self-esteem, anxiety attacks, marital hardships, crying and sleeplessness).

## IV. PUNITIVE DAMAGES

[¶ 20] In 1997, the Legislature also amended the Maine Human Rights Act to provide for punitive damages in cases of intentional employment discrimination. P.L. 1997, ch. 400, § 1 (codified at 5 M.R.S.A § 4613(2)(B)(8)). Again, the purpose of the amendment was to bring Maine law in line with federal law under Title VII of the Federal Civil Rights Act. *See* L.D. 1713, Statement of Fact (118th Legis.1997). As with the Federal Civil Rights Act, a party may recover punitive damages under the Maine Human Rights Act if he or she "demonstrates that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference to [his or her] ... rights ... protected by this Act." *See* 5 M.R.S.A. § 4613(2)(B)(8)(c); 42 U.S.C.A. § 1981a(b)(1). Federal precedent on Title VII provides useful guidance for our interpretation of the Maine Human Rights Act, particularly where, as here, language is borrowed directly from federal law. *See Winston v. Maine Technical College System*, 631 A.2d 70, 74 (Me.1993); *Bowen v. Department*

*of Human Services,* 606 A.2d 1051, 1053 (Me. 1992); *Percy v. Allen,* 449 A.2d 337, 342 (Me.1982).

[¶ 21] In *Dudley v. Wal–Mart Stores, Inc.,* 166 F.3d 1317, 1323 (11th Cir.1999), the United States Court of Appeals for the Eleventh Circuit held that the trial court abused its discretion by awarding punitive damages against the employer in a Title VII racial discrimination suit. In that case, a Wal–Mart store's co-manager and assistant manager denied one employee a promotion and demoted another because of their race. *Id.* at 1319. The court noted that no one in upper management knew of the discriminatory conduct and held that neither employee was high enough in the corporate hierarchy to allow their conduct to be the basis for punitive damages against the corporation. *Id.* at 1323. The key to *Dudley* is that punitive damages should be awarded against those who have done wrong, not "those who have liability by implication of law only." *Id.* *See also Splunge v. Shoney's, Inc.,* 97 F.3d 488, 490–91 (11th Cir.1996) (holding in Title VII sexual harassment case, that actions of area supervisor and others did not constitute sufficient knowledge to hold employer liable for punitive damages; mere constructive knowledge of conduct was not enough).

[¶ 22] The United States Court of Appeals for the Fifth Circuit has also required that upper management be aware of the discriminatory acts before punitive damages can be levied against a corporate employee. *See Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 944 (5th Cir.1996). The court held it was an abuse of discretion to award punitives in a Title VII racial discrimination case where the activities were solely those of a project manager at a nursing facility. *Id.* Despite controlling the hiring, firing and scheduling of various employees, the court emphasized that the employer had no knowledge of the employee's conduct, and never authorized, ratified, or approved it.[3] *Id.*

[¶ 23] By requiring something more than constructive knowledge before imposing punitives on a corporate employer, the law encourages employees to notify upper-level management of discriminatory practices, thus allowing employers the opportunity to rectify unlawful behavior, an announced aim of the Maine Human Rights Act. *See* 5 M.R.S.A. § 4552 (Pamph.1998).

[¶ 24] In *Tuttle v. Raymond,* 494 A.2d 1353, 1355 (Me.1985), we discussed the nature of punitive damages, stating: "the doctrine ... survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." "Notions of fairness and efficiency weigh against allowing exemplary awards where the stated goal of deterring reprehensible conduct would be furthered only marginally or not at all." *Id.* at 1360.

■ [¶ 25] In this case, the justifications for punitive damages have not been met. The trial court's award is directed at Davric, yet all of the discriminatory acts were committed by Duffy. While Duffy did have limited power to hire and fire security officers at Scarborough Downs, and to establish work schedules and duties, he was not a member of corporate management. There is nothing in the record to show that prior to Kopenga's letter declaring her intention to quit that Davric had or should have had any knowledge of Duffy's conduct, or that it somehow authorized, ratified, or approved it. To the contrary, when Kelly Foster, the general manager at Scarborough Downs, learned of Duffy's actions, she met with him to explain the actions were in violation of company policy, and required him to alter the discriminatory practices.

---

3. *Patterson* has been questioned by *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581, 592–93 (5th Cir.1998), in light of the Supreme Court's decision applying agency principles to determine vicarious liability in Title VII sexual harassment cases. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The validity of *Deffenbaugh–Williams* itself, however, is doubtful first, because it has been vacated for a rehearing en banc, *Williams v. Wal–Mart Stores, Inc.,* 169 F.3d 215 (5th Cir.1999), and second, because *Faragher* does not address punitive damages.

[¶ 26] Because neither the trial court's findings nor the record support the prerequisites for an award of punitive damages, we vacate the award of punitive damages.

The entry is:

Judgment modified to delete the award of punitive damages. As modified the judgment is affirmed.