STATE OF MAINE                                          SUPERIOR COURT
PENOBSCOT, SS.                                          Docket No. CV-00-83

FILED AND ENTERED
SUPERIOR COURT

DEC 17 2001

PENOBSCOT COUNTY

Joan Gilles,                        )
        Plaintiff               )
                                    )
                                    )
          v.                 )       **DECISION AND JUDGMENT**
                                    )
                                    )
Prison Health Services, Inc.,       )
        Defendant                )

At a jury trial held in this matter, the defendant was found to have engaged in unlawful employment discrimination against the plaintiff on three separate occasions in late 1998 and late 1999. On the basis of this actionable conduct, the jury awarded the plaintiff non-economic compensatory damages of $75,000 and punitive damages of $125,000. The parties agreed that the plaintiff's claims for backpay and frontpay would be decided by the court if (as it did) the jury found for the plaintiff on her liability claim. Accordingly, on September 13, 2001, a jury-waived hearing was held on those elements of damages that were not submitted to the jury. The evidence developed at the September 13 hearing was intended to supplement evidence presented to the jury, to the extent that the latter also has relevance to the reserved damages issues. Following the presentation of evidence on September 13, the parties submitted written

1

argument, which the court has considered.

## A. Backpay

### (1) Employment income

The jury concluded that the plaintiff suffered an adverse employment action in three employment decisions made by the defendant: first, in November 1998 when the plaintiff was not promoted to team leader; second, in November 1999, when she was not promoted to program administrator; and third, on December 3, 1999, when she was discharged. Despite the suggestions made by the plaintiff in her written argument, the court is unable to establish the date in November 1998 when a person other than the plaintiff was assigned to the position of team leader. Thus, in determining past lost wages relevant to that employment action, the court uses the date of November 31, 1998. The record does establish that the defendant's employment decision not to promote the plaintiff to program administrator occurred on November 1, 1999. *See* plaintiff's exhibit 107.

The parties' damages analyses are predicated on her 1999 wages. For eleven months, her gross income was $33,852. This is equivalent to $3,077 monthly, or $142 daily, or $710 weekly or $36,929 annually. The position of team leader carried an hourly wage of $20.60 or $42,848 per year or $3,570 per month. Therefore, during the eleven month period when, based on the jury's verdict, the plaintiff was wrongfully deprived of that position (i.e., the time between November 31, 1998, and November 1, 1999), her lost income amounted to $5,423.

Five weeks elapsed between the defendant's wrongful failure to promote her to program administrator and its wrongful discharge of her.

The program administrator earned $24.11 her hour, or $193 per day, or $964 per week.[1] The plaintiff thus lost a total of $1,270 (net loss of $254 per week for five weeks).

Since June 6, 2001, the plaintiff has been employed by the Spurwink School. Seventy-nine weeks elapsed between her discharge from the defendant and the resumption of outside employment. This resulted in a loss of income of $76,156. During that time, the plaintiff continued her work as a self-employed consultant. She earned approximately $30,000 during that interim; this is equivalent to $20,000 annually. This represents an increase from the rate of income she had earned in that capacity during the time she was employed with the defendant, due to the additional time available to devote to her own venture.. The plaintiff testified that after the defendant discharged her, she earned "two-thirds more" through her consulting work than if she had remained in the defendant's employ. Based on this formula proposed by the plaintiff, the additional annual income made available because of the defendant's termination of her would be $8,000.[2]

However, the better evidence of the plaintiff's enhanced earning capacity, following her discharge, rests on her actual self-employment

---

[1] In late January 2000, the program administator received a modest pay raise retroactive to January 1, 2000. *See* plaintiff's exhibit 108. The record does not reveal whether this raise was due to factors unique to the person who had been hired to that position over the plaintiff, or whether the raise was attributable to circumstances that would have included the plaintiff. Accordingly, this increase in income cannot be used as a basis to determine the plaintiff's damages.

[2] If her income increased by 2/3 and resulted in total income of $20,000 annually, then the income she would have earned irrespective of her termination would have been $12,000. An additional two-thirds of that amount is $8,000, resulting in the total annual figure of $20,000.

income during the time she was employed by the defendant. She became employed by the defendant in mid-November 1997. In 1998, when she was fully employed by the defendant, her net self-employment income was actually a net loss of roughly $300. Then, in 1999, when she worked for the defendant through early December, her self-employment income was nearly $500. From this, the court concludes that virtually all of the plaintiff's income generated by her consulting work, during that time when she was not employed by others, is attributable to that lack of outside employment. Therefore, for the period of time between December 3, 1999, and June 6, 2001, from the amount of income the plaintiff would have earned if the defendant installed her as program administrator in December 1999, the court deducts all of her self-employment income, which is $30,000. *See LeBlond v. Sentinel Service*, 635 A.2d 943, 945 (Me. 1993) (lost wages to be reduced by amount of income earned through other employment).

Based on these calculations, the plaintiff is entitled to compensatory damages of $46,156 for the period of time between December 3, 1999, and June 6, 2001.

As of December 17, 2001, the plaintiff has been employed by the Spurwink School for nearly twenty-eight weeks. Her annual income is $41,204, or $792 per week. On a weekly basis, this is $172 less than the income earned by the defendant's program administrator. Over a period of twenty-eight weeks, the plaintiff's net loss is $4,816.

When lost employment income for these various periods of time are added, they amount to a total of $57,665 ($5,423 plus $1,270 plus $46,156 plus $4,816).

4

## (2) Value of benefits

Citing competing lines of authority,[3] the parties disagree on whether the value of benefits may be included in the backpay computation. The court's authority to award backpay is established in 5 M.R.S.A. § 4613(2)(B)(2). The meaning of the statutory term "back pay" is determined by statutory interpretation, which is a matter of law. *Estate of Spear*, 1997 ME 15, ¶ 6, 689 A.2d 590, 591. "The fundamental rule in statutory construction is that words must be given their plain ordinary meaning." *Id.* at ¶ 7, 689 A.2d at 591. In interpreting a statute, the court reads the plain meaning of the statutory language in order to give effect to the intent of the legislature. *Id.* "Words must be given meaning and not treated as meaningless and superfluous." *Stromberg-Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566, 569. Furthermore, the court must "remain mindful of the whole statutory scheme, of which the section at issue forms a part, so that a harmonious result may be achieved." *State v. Seamen's Club*, 1997 ME 70, ¶ 14, 691 A.2d 1248, 1252.

Section 4613(2) establishes a broad variety of judicial responses that may be ordered as "appropriate. . .remedies" to unlawful discrimination. Most of those remedies are compensatory in nature. Several discrete portions of section 4613(2) provide the basis for an assessment of non-

---

[3]However, of the three cases cited by the plaintiff, only one (*Long v. Ringling Bros.-Barnum & Bailey*, 9 F.3d 340, 343 (4th Cir. 1993)) directly supports her position. Of the other two, *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 841 (6th Cir. 1994) affirmed a judgment that awarded the plaintiff the actual costs of medical treatment that would have been covered by insurance through her former employment. In the case at bar, the defendant does not contest this principle of law. And in *Metz v, Merrill, Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482, 1494 (10th Cir. 1994), the case was remanded because the trial court erred in finding that evidence of some unspecified fringe benefits was too speculative to justify an award of damages.

compensatory damages against the wrongdoer. Those provisions for non-compensatory damages, *see* 5 M.R.S.A. §§ 4613(2)(B)(6)-(8), are qualitatively distinguishable from the compensatory provisions, *see* sections 4613(B)(1)-(5). The provision for an award of backpay is not included in any of the sections that allows for penal or punitive awards. From this, the court infers that the legislature's creation of an award for backpay was intended to be a mechanism for making the employee whole. *See also Kopenga v. Davric Maine Corp.* 1999 ME 65, ¶ 11, 727 A.2d 906, 909. On this basis, the employee is entitled to reimbursement for wages and income that she would have received but for the unlawful employment discrimination.

Based on the same principle, the employee would be entitled to recover the value of benefits, only if the deprivation of those benefits occasioned by the employer's unlawful conduct resulted in an actual loss to the employee.[4] Here, when the plaintiff was terminated, she lost several forms of insurance (life insurance and dental coverage for herself and her husband, and disability insurance). If in fact the plaintiff sustained a loss that would have been covered by any form of insurance that was available to her through her employment with the defendant, then she would have a persuasive argument here that the employer would be liable for the

---

[4]This appears to have been the situation in *Rozanski v. A-P-A Transport, Inc.*, 512 A.2d 335 (Me. 1986). There, the plaintiffs and their dependents lost health care coverage because of the employer's wrongful conduct. As a result, the plaintiffs incurred "costs for themselves" that would have been covered under the employment-related plans. *Id.* at 343. In the case at bar, there is no evidence that the plaintiff incurred such costs (either the cost of procuring substitute coverage or expenses that would have been covered under the policies she had through her employment with the defendant).

financial disadvantage created by the loss of the benefit.[5] However, the record does not show that the plaintiff was deprived of some gain that she would have received if the employment benefits had been in effect subsequent to the employer's unlawful conduct. Additionally, there is no evidence that the plaintiff had the option of receiving the value of the benefit (as opposed to the benefit itself) as part of her compensation. Therefore, in calculating the plaintiff's backpay, the court excludes consideration of the value of unrealized fringe benefits.[6] *See McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals*, 140 F.3d 288, 304 (1st Cir. 1998), *cert. den'd*, 525 U.S. 1104 (1999).

With respect to the calculation of frontpay, on the other hand, the court reaches the opposite conclusion. The cost or value of insurance coverage is excluded as an element of backpay because there is no

---

[5] The plaintiff argues that under the construction adopted here by the court, the defendant gains a windfall because it did not have to pay for the plaintiff's fringe benefits after it wrongfully discharged her and because it now retains that benefit. However, the defendant appears to agree that if the plaintiff suffered a post-termination loss that would have been covered by the policies she had through her employment with the defendant, then the defendant would be liable to reimburse her for the benefits she would have received under those policies. Therefore, even though the defendant benefits from the court's analysis under the present circumstances, it has been exposed to an award of damages far greater than the cost of the premiums. In this material respect, this case differs from *Maine Human Rights Comm'n v. Dep't of Corrections*, 474 A.2d 860, 870 (Me. 1984) (holding that backpay should not be reduced by the amounts of unemployment benefits that the employee received after the employer's wrongful employment action).

[6] Title 26 M.R.S.A. § 629-A, cited by the plaintiff, is unavailing to her. There, the legislature expressly provided that when an employer becomes insolvent, an employee is entitled to recover unpaid wages, which, through that statute, includes "all fringe benefits earned by the employee. . ., including plans for retirement, insurance, health care and vacations." Thus, although the legislature has demonstrated its ability to specifically include the value of those benefits as part of an employee's recovery for some types of claims, it failed to do so in connection with the type of claim at issue here.

7

evidence that, up to the present time, the plaintiff would have been entitled to the proceeds of her insurance coverage. Therefore, as it happily turned out, those coverages were unnecessary. However, those same benefits have meaning for the future course. Prospectively, because of the uncertainty of the future, it is the existence of coverage that has value as part of an employee's compensation. (Retrospectively, because of the certainty of the past, in order to determine the employee's damages caused by wrongful termination, the focus must be on whether a covered event in fact occurred.) Therefore, in determining the plaintiff's award for loss of future income and compensation, the cost of those benefits must be considered.

## B. Frontpay

In considering the plaintiff's claim for lost future earnings resulting from her wrongful discharge,[7] the first issue to address is the extent of her future work expectancy. The plaintiff is nearly 70 years old. She testified that she plans to work for her remaining years. The present record does not include average work expectancies. Even if that information were part of the record, it would not carry much weight because the plaintiff is a person of uncommon vocational vigor that would make comparisons to "average" workers insignificant.

Irrespective of the circumstances, any present award of damages based on future losses is affected by some level of speculation. Whether the claim is for future pain and suffering, future medical expenses or loss of future earnings, it is impossible for a factfinder to know the actual

---

[7]Neither party seeks an order requiring the defendant to reinstate the plaintiff. In the circumstances of this case, that form of relief would not be appropriate.

8

duration of those future damages. In the setting presented here, even if the plaintiff were younger than the average retiree, one could not establish whether the plaintiff in fact would remain employed only up to that average retirement date, or keep going, or quit earlier. As a result, a factfinder can only assess those future losses based on the most likely projection revealed by current circumstances.

Here, the plaintiff is nearly 70 years old, healthy, vigorous and committed to remain in the workforce indefinitely. Federally compiled vital statistics reveal that she has a remaining life expectancy of 15 years.[8] From all of these circumstances, the court projects that the plaintiff is likely to remain employed for at least five more years.

The annual income of the defendant's program director (excluding the value of benefits) is $50,128. As is noted above, the plaintiff's current annual income is $41,204. The difference in income is therefore $8,924 annually, or $44,620 over the course of five years.

For the reasons discussed above, as part of her damages for frontpay, the plaintiff is also entitled to recover for the proven value of fringe benefits she lost when she was wrongfully discharged. Those benefits consisted of various types of insurance coverage. The record is adequate to establish the cost of only one of those coverages, namely, dental. While she was employed by the defendant, the plaintiff obtained dental coverage for herself and her husband. The parties stipulated that this was the "PDO" level of coverage and that the COBRA rate of $73.56 is 102% of the cost to the defendant. *See* plaintiff's exhibit 105. The employer-defendant's cost

---

[8]Life tables setting out life expectancies are included in volume 17 of the Maine statutes.

for this coverage therefore was $72 per month. Of this, the plaintiff herself paid $16 biweekly. Over the course of one year, the value of this benefit accruing to the plaintiff was $448 ($864 per year, less $416 paid by the plaintiff). For the upcoming five year period for which the plaintiff is entitled to recover frontpay, the value of that lost benefit is $2,080.

The plaintiff has failed to establish the value of the other coverages that she had secured through her employment with the defendant. She testified regarding the cost to obtain those coverages on her own and also stated that her separate costs are "more than twice" the cost of group coverage available through her former employment. (The difference between the two would be the value of the benefit, because this is the amount of the cost for those insurances that she saved as a consequence of her employment with the defendant.) This evidence is not adequate for the court to reasonably fix the cost for those other forms of coverage.

When the value of the lost dental coverage is added to her lost future wages, the total amount of her loss is $46,700.

Because this figure represents the cumulative amount of her wage and benefit loss over the course of the next five years, and because she is entitled to present recovery for those future losses, the parties correctly observe that the amount of those losses must be reduced to its present value to account for the time value of money. *See Ginn v. Penobscot Co.*, 334 A.2d 874, 884-85 (Me. 1975); *O'Brien v. J.G. White and Co.*, 105 Me. 308, 316 (1909). The parties did not offer evidence regarding present value. Under *Ginn*, such evidence is not required. There, the court instructed the jury that it *could* consider a discount rate of 5.5%. 334 A.2d at 884. Although any challenge to this issue was not preserved for appeal,

10

the *Ginn* Court nonetheless held that this instruction was not error. *Id.* Without relying on *Ginn* for the amount of the discount rate itself, the court concludes that a 5% is an approximate but reasonable reflection of the return that one could safely expect on an investment and that the plaintiff's recovery for future losses should therefore be reduced by this factor.

To implement this discount rate for the five year period, the court reduces the total future losses by 12.5%. This flows from the fact that the mid-point of that five year period will be reached in two and a half years. Two and a half years from now, the plaintiff would have had the benefit of 12.5% appreciation from a present investment, if her annual return is 5%. At that time, the plaintiff would have received half of the frontpay for which she is to be compensated presently. As used here, that median is a point used to determine the discounted value of the entire stream of future earnings lost by the plaintiff. Moneys that would be received prior to that mid-point would be subject to a smaller discount than moneys received subsequently, because the cumulative return on short term investments is less than that on longer term investments. Therefore, the reduction factor of 12.5% overstates the discount for first two and a half years of lost earnings, but it understates -- to an approximately equal degree -- the discount for the balance. (The court does not take into account any gain attributable to reinvested earnings. In the present circumstances, that additional benefit is not of such significance to vitiate this analysis.) Therefore, the aggregated future loss of $46,700 shall be reduced by 12.5%, or approximately $5,830. This results in a frontpay award of $40,870.

The entry shall be:

Pursuant to the jury verdict and the court order of this date, judgment is entered for the plaintiff. She is awarded total compensatory damages of $173,535 (consisting of non-pecuniary damages of $75,000 as awarded by the jury, in addition to backpay of $57,665 and frontpay of $40,870 as assessed by the court); punitive damages of $125,000; interest at the statutory rate; and her costs of court.

Dated: December 15, 2001

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

Date Filed __4/14/2000__ ____PENOBSCOT____ Docket No. ____CV-2000-83 closed__

County

Action __CIVIL - DAMAGES (WHISTLE BLOWER)__

Jeffrey L. Hjelm, Specially Assigned Justice

Added

PRISON HEALTH SERVICES, INC. - 6/23/0

JOAN GILLES                    vs.    *AMERICA SERVICE GROUP, INC. **Dismissed**
                                                                    7/9/01

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| GILBERT & GREIF<br>P O BOX 2339 - 82 Columbia Street<br>BANGOR ME 04402-2339<br>BY: Arthur J. Greif, Esq.<br>   Julie D. Farr, Esq. | Douglas, Denham, Buccina & Ernst<br>103 Exchange Street<br>PO Box 7108<br>Portland, Maine   04112-7108<br>BY: James E. Fortin, Esq. |

| Date of Entry | |
|---|---|
| 4/14/00 | Complaint filed. |

STATE OF MAINE                              SUPERIOR COURT
PENOBSCOT, SS.                              Docket No. CV-00-83

Joan Gilles,                    )
            Plaintiff           )
                                )
                                )
                                )
        v.                      )    ORDER (MOTION FOR NEW TRIAL;
                                )    BILL OF COSTS; INTEREST)
                                )
Prison Health Services, Inc.,   )
            Defendant           )

FILED AND ENTERED
SUPERIOR COURT

JAN 1 6 2002

PENOBSCOT COUNTY

This order will address the defendant's post-trial motion and the plaintiff's bill of costs.

**A. Motion for judgment/new trial**

The defendant's renewed motion for judgment as a matter of law or for new trial is denied. To the extent that the motion is grounded on issues raised and resolved previously, the court declines to change its rulings. To the extent that the motion is grounded on issues that were not raised previously, the court considers those issues to be waived and not the basis for relief here.

**B. Bill of costs**

The plaintiff has submitted a bill of costs. The parties have filed submissions pursuant to 14 M.R.S.A. § 1502-D.

The defendant objects to an award of costs associated with five discovery depositions, two trial depositions, trial exhibits and travel. The

1

court concludes that each of these costs shall be allowed.[1]

The discovery depositions were of five people (some of whom are still associated with the defendant) who were central to the case or, at the very least, had information important to the case. The decisions to take those depositions were reasonable, and their costs are appropriate.

The two trial depositions were taken at the defendant's initiative. Because they were specifically intended for use at trial, it would be both reasonable and foreseeable to expect that the plaintiff would obtain copies of the resulting transcripts. That Bonney-Corson's deposition already had been taken as part of pretrial discovery did not warrant the plaintiff in foregoing a copy of the transcript that would actually be used at trial.

The expenses for trial exhibits are reasonable.

Finally, counsel's travel expense incurred to attend Bonney-Corson's deposition in Augusta is fair and within the objective of 14 M.R.S.A. § 1502-B(4). In the absence of exceptional circumstances, this court routinely denies an award of travel expenses for out-of-town counsel to attend the trial itself, because the non-prevailing party should not be required to subsidize the prevailing party's decision to retain an attorney from away. Here, however, the defendant scheduled a deposition to create the trial testimony of an important trial witness, and that deposition was scheduled some distance from this proceeding's venue. In its essence, the deposition was the functional equivalent of a court session. Counsel had no choice but to attend that deposition, and there is no basis on which to deny

---

[1] The plaintiff has not yet filed her application for an award of attorney's fees. *See* 5 M.R.S.A. § 4614. If the plaintiff is entitled to an award of those fees, *see* 5 M.R.S.A. § 4622, then the court would expect that these challenged costs might be awarded in that context, even if they were not proper as costs of court under 14 M.R.S.A. § 1502-B *et seq.*

2

this cost that is presumptively awarded to a prevailing party. *See* 14 M.R.S.A. § 1502-B (". . .shall be allowed to prevailing parties in a civil case unless the court otherwise specifically directs: . . .").

## C. Pre-judgment interest

Pre-judgment interest shall be awarded on all components of the judgment. The only objection made by the defendant that merits comment is its argument that pre-judgment interest should not be awarded on that part of the judgment that compensates the plaintiff for future losses.

"Pre-judgment interest, disapproved of at common law, was created by the Legislature as a measure of damages to penalize defendants for delay and to encourage the pretrial settlement of clearly meritorious suits. . . .Such interest is designed to compensate an injured party for the inability to use money rightfully belonging to that party between the date suit is filed and the date judgment is entered." *Osgood v. Osgood*, 1997 ME 192, ¶ 10, 698 A.2d 1071, 1073 (citation omitted). Here, none of these purposes is undermined by an award of pre-judgment interest based on the entire judgment, and, in fact, those purposes would be compromised if pre-judgment interest were applied to less than the full judgment. Compensatory damages for the plaintiff's future losses have already been reduced to their present value. This means that the plaintiff is entitled to the present use and possession of the present value of those future losses. Because she is entitled to have that money now, she is entitled to compensation, in the form of pre-judgment interest, for her "inability to use [that] money rightfully belonging to" her. *Id.* Additionally, if pre-judgment interest were inapplicable to this or any other element of her damages, then the legislative objectives of settlement and timely

3

resolution of civil disputes would be frustrated.

The entry will be:

The defendant's renewed motion for judgment as a matter of law or for new trial is denied.

The plaintiff is awarded court costs of $3,322.49. Pre-judgment and post-judgment interest shall be calculated on the basis of the entire amount of the judgment entered on December 15, 2001.

Dated: January 15, 2002

_____
Justice, Maine Superior Court

4