MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2024 ME 64
Docket:       Cum-23-479
Submitted
  On Briefs:  June 26, 2024
Decided:      August 20, 2024

Panel:        STANFILL, C.J., and MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.

REBECCA ADEYANJU

v.

FOOT AND ANKLE ASSOCIATES OF MAINE, P.A.

HORTON, J.

[¶1]  Rebecca Adeyanju appeals from the entry of a summary judgment by the Superior Court (Cumberland County, *Cashman, J.*) in favor of her former employer, Foot and Ankle Associates of Maine, P.A., on Adeyanju's complaint alleging employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17 (Westlaw through Pub. L. No. 118-70) and under 42 U.S.C.A. § 1981 (Westlaw through Pub. L. No. 118-70).  The court concluded that Adeyanju had not made a showing sufficient to withstand Foot and Ankle's motion for summary judgment on her claim that Foot and Ankle's decision to terminate her employment was motivated by discriminatory animus and that the reason given by Foot and Ankle for the termination was pretextual.  Because we conclude that the summary judgment record reveals

2

genuine issues of material fact, we vacate the summary judgment and remand for trial.

## I. BACKGROUND

[¶2]    The following facts are drawn from the parties' supported statements of material facts and are presented in the light most favorable to Adeyanju as the party against whom summary judgment was entered. *See Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 11, 974 A.2d 276.

[¶3]  Foot and Ankle hired Adeyanju, a White woman, as both a medical assistant and a radiology technician in 2012.  Foot and Ankle informed her at the outset that she could not miss more than three workdays in a row without a doctor's note.  Adeyanju's performance while working at the office was good—nobody complained about her, and she was never subject to any discipline before her termination.  In 2014 or 2015, Adeyanju informed her employer that she was in a romantic relationship with a Black man who had come to the United States from Nigeria, and she received approval for five consecutive days off to visit his family in Nigeria.  In 2015, Adeyanju had to get a ride to work from a coworker because her boyfriend had their shared vehicle and did not return it to Adeyanju due to inclement weather.  The practice manager met with Adeyanju in private and, after stating that she did not want

to know about Adeyanju's personal life, expressed concern about Adeyanju sharing a vehicle, saying that she did not want anything to jeopardize Adeyanju's job. The practice manager did not appear to have had a problem with another employee, who had shared a car with her White husband, being late for work due to her transportation issues.[1]

[¶4] Adeyanju married her boyfriend in 2018. When Adeyanju's husband visited the workplace as a patient or with their child, nobody expressed racial animosity toward him or commented on the interracial relationship.

[¶5] In August 2019, United States Immigration and Customs Enforcement (ICE) agents began seeking Adeyanju's husband in connection with criminal charges. On August 21, 2019, Adeyanju told the practice manager and a physician at the practice, Michael Saraydarian, that ICE was looking for her husband and that an agent might come to the office.

[¶6] Although scheduled to work on Thursday, August 22, 2019, Adeyanju did not attend work because she was helping her husband find a lawyer. The practice manager was out that day, so Adeyanju notified

---

[1] Although the statement of material facts does not state that the other employee was sometimes late because of the car-sharing arrangement with her husband, it implies this fact and the cited portion of the summary judgment record (Adeyanju's deposition) reports this.

Saraydarian via text message at 7:20 a.m. that she would not be going to work. He responded, "Ok sorry for your situation." The next day, Friday, August 23, 2019, Adeyanju sent another text message to Saraydarian at 6:17 a.m.: "Dr s i dont think i can come to work today. Im scared. My body shakes. We are trying to raise money so we can surrender with a lawyer. Im just scared." Saraydarian replied, "Thanks for letting me know."

[¶7] At some point during Adeyanju's absence, an ICE agent came to Foot and Ankle's office. The agent spoke with the receptionist and with Saraydarian, who informed the agent that Adeyanju was not there and accepted the agent's card when the agent asked him to make contact if Adeyanju came to work. Saraydarian had never dealt with ICE before and contacted the practice's insurance company after the encounter.

[¶8] On her next scheduled work day, Monday, August 26, 2019, Adeyanju sent another text message to Saraydarian at 6:21 a.m.: "Dr s i cant come in. Im so sorry. We have to get to our interview wednesday." Saraydarian read the message but did not respond. Later that day, Saraydarian and the practice manager decided to terminate Adeyanju's employment. The practice manager called and left a voicemail for Adeyanju, then sent a text message at 1:30 p.m. stating, "I need to speak with you regarding work." Adeyanju did not

respond to the text message but tried to call the practice manager that evening at 7:42 p.m.  The practice manager did not answer.

[¶9]  On Tuesday morning, August 27, 2019, Adeyanju arrived at work at her usual time.  Soon thereafter, the practice manager brought Adeyanju into her office and stated, "[W]e are terminating your position for job abandonment.  I don't want to know anything about your personal life."  The reference to job abandonment was based on Adeyanju's missing work for three days.

[¶10]  Throughout her three days of absence from work, Adeyanju communicated about her situation with a coworker and expressed concern about Foot and Ankle's response to her absence.  In the exchange of text messages, the coworker reassured Adeyanju that Saraydarian was not mad at her and instead felt bad for her.  The coworker told Adeyanju not to stress out because she did not think Adeyanju's absence was creating a problem—other employees were covering her responsibilities.  The coworker also spoke with Saraydarian and the practice manager about Adeyanju's absence.

[¶11]  At no time during the three days when Adeyanju missed work did anyone inform her that her employment was at risk of termination if she did not report to work.  No other employee had previously been terminated for missing work, nor had the practice manager been strict about employee

6

attendance when urgent situations had arisen in the past. Employees had been allowed days or even weeks off when they had had heart attacks or car accidents. Adeyanju had also been allowed to take time off when there was an issue with her child's daycare. As of the day her employment was terminated, Adeyanju had thirty-five hours of vacation time available for use. She was already scheduled to be off from work on the following day, Wednesday, August 28, 2019.

[¶12] After Adeyanju filed a discrimination complaint with the Maine Human Rights Commission and federal Equal Employment Opportunity Commission, Foot and Ankle's response to the complaint indicated that Adeyanju had missed work on August 22, 23, and 26 and falsely stated that she "did not communicate a reason why she did not show up on those consecutive [work] days." It took Foot and Ankle two months after it terminated Adeyanju's employment to fill her position, and it has since hired and fired multiple medical assistants.

[¶13] The husband of another employee at the workplace also faced one or more criminal charges. That employee informed the practice manager and Saraydarian about the charges when they arose in 2015. That employee took some time off from work in connection with the charges, but it is not clear

whether that time off was scheduled or unannounced. That employee, whose husband is White, faced no negative workplace consequences.

[¶14] On April 6, 2022, after her administrative complaint had been dismissed and she had received a right-to-sue letter, Adeyanju filed a complaint against Foot and Ankle in the Superior Court. She successfully moved for leave to file an amended complaint and filed the first amended complaint at issue here, alleging employment discrimination under section 1981 and Title VII of the Civil Rights Act of 1964 and seeking declaratory and injunctive relief, back pay, other lost benefits and compensation, reinstatement, damages, attorney fees and costs, and interest.[2] Foot and Ankle filed an answer in August 2022.

[¶15] Foot and Ankle moved for summary judgment and provided a statement of material facts with supporting record references. *See* M.R. Civ. P. 56(h)(1). Adeyanju opposed the motion and filed an opposing statement of material facts and additional facts with supporting record references. *See* M.R. Civ. P. 56(h)(2). Foot and Ankle did not file a reply. *See* M.R. Civ. P. 56(h)(3).

---

[2] State courts have concurrent jurisdiction with federal courts over Title VII claims. *See Donnelly v. Yellow Freight Sys., Inc.*, 874 F.2d 402, 405-10 (7th Cir. 1989), *aff'd*, 494 U.S. 820 (1990); *Kopenga v. Davric Me. Corp.*, 1999 ME 65, 727 A.2d 906; *Bowen v. Dep't of Hum. Servs.*, 606 A.2d 1051 (Me. 1992); *Claflin v. Houseman*, 93 U.S. 130, 136 (1876); *cf. Levesque v. Androscoggin Cnty.*, 2012 ME 114, 56 A.3d 1227 (constructive discharge).

8

[¶16]  The court granted the motion for summary judgment, concluding that there were no genuine issues of material fact as to whether the termination was motivated by discriminatory animus or whether Foot and Ankle's stated reason for termination was pretextual.  Adeyanju timely appealed from the judgment.  *See* 14 M.R.S. § 1851 (2024); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶17]  We review de novo a court's entry of a summary judgment, "viewing the facts and any inferences that may be drawn from them in the light most favorable to the nonprevailing party to determine if the statements of material facts and referenced record evidence generate a genuine issue of material fact."  *Cookson,* 2009 ME 57, ¶ 11, 974 A.2d 276.  "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter."  *Id.* (quotation marks omitted).  Even if "one party's version of the facts appears more credible and persuasive to the court, a summary judgment is inappropriate if a genuine factual dispute exists that is material to the outcome, in which case the dispute must be resolved through fact-finding, regardless of the nonmoving party's likelihood of success."  *Id.* ¶ 12.

[¶18]  Title VII of the Civil Rights Act of 1964 provides, in relevant part, "It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C.A. § 2000e-2(a)(1).  Section 1981 provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C.A. § 1981(a).

[¶19]  In analyzing a claim under Title VII and section 1981 in which there is no direct evidence of discrimination, courts apply the three-step burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722 ("We follow a three-step, burden-shifting analysis to evaluate employment discrimination claims at the summary judgment stage.").  At the first step in a wrongful termination case, "the plaintiff must show that (1) she was within a protected class, (2) possessed the necessary qualifications and adequately performed her job, (3) but was nevertheless dismissed and (4) her employer sought someone of roughly equivalent qualifications to

perform substantially the same work." *Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005). If the employee makes that showing, the burden of production at the second step shifts to the employer to "articulate a legitimate non-discriminatory reason" for the employment action. *Id.* (quotation marks omitted). "If the employer articulates such a reason, the burden [at the third step] shifts back to the plaintiff, who must then offer evidence sufficient to support a finding that it is more likely than not that the employer's proffered reason for the adverse employment action was pretextual and that the true reason was unlawful discrimination." *Joseph v. Lincare, Inc.*, 989 F.3d 147, 158 (1st Cir. 2021).

[¶20] In asserting her Title VII claim, Adeyanju has also argued that Foot and Ankle may have had a mixed motive—i.e., that her husband's race, color, or national origin was a "motivating factor" in Foot and Ankle's decision to terminate her employment. 42 U.S.C.A. § 2000e-2(m) ("Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). "[D]irect evidence of discrimination is not required in mixed-motive cases," and an employee may

rely on circumstantial evidence, such as evidence that "a defendant's explanation for employment practice is 'unworthy of credence.'" *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101-02 (2003) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000)); *see Stanley v. Hancock Cnty. Comm'rs*, 2004 ME 157, ¶ 20, 864 A.2d 169. However, if an employer shows that, despite its mixed motives, it "would have taken the same action in the absence of the impermissible motivating factor," it enjoys "a limited affirmative defense that . . . restricts the remedies available to a plaintiff." *Desert Palace, Inc.,* 539 U.S. at 94-95; *see* 42 U.S.C.A. § 2000e-5(g)(2)(B).[3]

## A.    Prima Facie Case

[¶21]  In addressing an employer's motion for summary judgment on an employee's Title VII discrimination claim, the question for the trial court is whether the employee has made a prima facie showing sufficient to meet the

---

[3] The statute provides,

**(B)** On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

**(i)** may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and

**(ii)** shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C.A. § 2000e-5(g)(2)(B) (Westlaw through Pub. L. No. 118-70).

employee's burden of production at the first step of the *McDonnell-Douglas* analysis and, assuming that the employer has met its burden at the second step, the third step also. *See Daniels*, 2012 ME 80, ¶¶ 14-17, 45 A.3d 722. The burden of production is met if the facts in the summary judgment record, viewed in the light most favorable to the employee as the nonmoving party, could support a finding in favor of the employee. *See id.* ¶¶ 13-15. We turn to the question of whether, viewed in the light most favorable to Adeyanju, the facts in the summary judgment record satisfy Adeyanju's burden of production. *See id.*

### 1. Member of a Protected Class

[¶22] Adeyanju here asserts "associational discrimination," in which "an employer purportedly disapproves of a social relationship between an employee and a third party on the basis of a protected characteristic and has taken an employment action based on that disapproval." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 272 (1st Cir. 2022). "[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's own race in addition to the race of the other person . . . ." *Id.* (quotation marks omitted). Given the facts alleged, Adeyanju has made a prima facie showing that she is a

member of a protected class by virtue of her marriage to her Black, Nigerian husband. *See id.*; *Joseph*, 989 F.3d at 158.

### 2. Adequate Job Performance

[¶23] The parties do not dispute that, until the events at issue here, Adeyanju had met Foot and Ankle's expectations of her in her job. *See Rodriguez-Torres*, 399 F.3d at 58; *Joseph*, 989 F.3d at 158.

### 3. Dismissal

[¶24] There is similarly no dispute that Adeyanju suffered an adverse employment action when she was dismissed from her employment. *See Rodriguez-Torres*, 399 F.3d at 58; *Joseph*, 989 F.3d at 158.

### 4. Hiring of Another

[¶25] The summary judgment record reveals no dispute that Foot and Ankle hired another medical assistant two months after terminating Adeyanju's employment and that it has hired and fired multiple medical assistants since then.

## B. Legitimate Nondiscriminatory Reason

[¶26] Foot and Ankle has met its second step burden of presenting a legitimate nondiscriminatory reason for terminating Adeyanju's employment—that she failed to appear for work on three consecutive

weekdays. Unlike Adeyanju's evidence at the first step, however, the validity of Foot and Ankle's stated reason is disputed. The parties do not dispute that Foot and Ankle had a policy against missing more than three days of work without a doctor's note and that its practice manager stated that it was terminating Adeyanju's employment for missing three days of work. The issue is whether Foot and Ankle's policy even applies here, given that Adeyanju missed three days of work, not *more than* three days.

## C.      Pretext and Discriminatory Animus

[¶27]  Adeyanju's burden at the third step was to show that the facts asserted in the summary judgment record raise a genuine issue as to whether Foot and Ankle's stated reason for terminating her employment was pretextual and that the true reason was "discriminatory within the meaning of Title VII." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 518-19 (1993) (quotation marks omitted). "[T]he critical question is whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that [the plaintiff] was fired" because the plaintiff was a member of a protected class. *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 25 (1st Cir. 2015) (quotation marks omitted). The court cannot, on summary judgment, weigh the strength of the competing inferences, *id.*, largely because "[d]eterminations

of motive and intent, particularly in discrimination cases, are questions better suited for the jury," *Mulero-Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir. 1996) (quotation marks omitted).

[¶28]  On the other hand, "the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer."  *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 843 (1st Cir. 1993)*.*  The court will enter summary judgment for the employer if the claim of discrimination "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (quotation marks omitted); *see González-Bermúdez v. Abbott Laboratories P.R. Inc.*, 990 F.3d 37, 44-45 (1st Cir. 2021).

[¶29]  A plaintiff must present "not only minimally sufficient evidence of pretext, but evidence that overall reasonably supports a finding of discriminatory animus."  *LeBlanc*, 6 F.3d at 843 (quotation marks omitted).[4]

---

[4]  "[T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory," for instance if "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *cf. Rodríguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999) (holding, before the Supreme Court's decision in *Reeves*, that even if an employee has shown that the reasons for termination were inaccurate, summary judgment could be

This may require the presentation of "additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 148-49; *but see Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002) ("[D]isbelief of the reason [for the employment decision] may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude that the employer had discriminated.").

[¶30] For example, to demonstrate that an asserted reason for adverse employment action was pretextual and that the action was motivated by discriminatory animus, the employee may offer independent evidence that the employer treated similarly situated employees *not* in the protected class more favorably after they committed the same policy violations. *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004).[5] A long and unblemished work history may also support a plaintiff's prima facie showing, although it "will not alone create a genuine issue of fact." *See Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1019-20 (8th Cir. 2005) (taking into consideration the employee's eleven-year positive work history when her employment was

---

entered if the employee offered no affirmative evidence that the employer's actions were based on the employee's membership in a protected class).

[5] In showing that employees are similarly situated, however, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004) (quotation marks omitted).

terminated two months after the birth of her disabled child). Additionally, "[p]roof that the defendant's explanation [for the adverse action] is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. A court will therefore consider whether there are "gaps and inconsistencies" in an employer's explanation of its reasons for taking the challenged employment action that make summary judgment inappropriate. *See Soto-Feliciano*, 779 F.3d at 27; *Gómez–González v. Rural Opportunities, Inc.,* 626 F.3d 654, 662-63 (1st Cir. 2010) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." (quotation marks omitted)).

[¶31]  The following facts, viewed in Adeyanju's favor, create genuine issues as to whether Foot and Ankle's reason for terminating her employment was pretextual and whether the termination was based on her protected status:

- Adeyanju contacted Saraydarian to explain her absence on all three days and then returned to work as usual, never indicating that she was abandoning her job.  Similarly, her communications with a coworker

during her absence expressed concern about Foot and Ankle's reaction to her absence.

- Foot and Ankle misrepresented the situation to the Maine Human Rights Commission by stating that Adeyanju had not communicated a reason for her absence.

- Foot and Ankle had not previously enforced the more-than-three-day policy by terminating employees' employment when they took three days or more off in emergency situations.

- Adeyanju did not violate Foot and Ankle's policy because she did not take "more than three days off."

- Foot and Ankle consented to Adeyanju's first day of absence by saying, "*Ok* sorry for your situation"; arguably consented to the second day of absence by saying, "Thanks for letting me know"; and after being notified that Adeyanju would be absent a third day, responded by saying only, "I need to speak to you regarding work." (Emphasis added.)

- Saraydarian and the practice manager decided to terminate Adeyanju's employment shortly after being visited by an ICE agent and contacting the practice's insurance company. Although nothing in Title VII "makes it illegal to discriminate on the basis of citizenship or alienage," *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973); *Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 939–41 (7th Cir. 2012), a fact-finder could infer that the involvement of ICE triggered Adeyanju's termination based on the race, color, or national origin of Adeyanju's husband.

- Although the practice manager told Adeyanju when she terminated Adeyanju's employment that she did not want to know about Adeyanju's personal life, the practice manager had considered the personal reasons for other employees' absences.

- Foot and Ankle treated Adeyanju differently than it treated employees with White husbands who also shared a vehicle with the employee or also faced criminal charges.

[¶32]   Although they are by no means conclusive, these facts and the reasonable inferences that may be drawn from them could support findings that (1) Foot and Ankle's explanation for the termination was pretextual and (2) Foot and Ankle was motivated by discriminatory animus in the decision to terminate her employment.  *See Daniels*, 2012 ME 80, ¶ 17, 45 A.3d 722.

**D.   Mixed-Motive Analysis**

[¶33]   Adeyanju further asserts that, even assuming her absence from work was a factor in Foot and Ankle's decision to terminate her employment, her husband's race, color, or national origin also played a role.   Under a mixed-motive analysis, the question is whether "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."   42 U.S.C.A. § 2000e-2(m). The same material facts that raise genuine issues as to pretext also raise genuine issues as to mixed motive and likewise preclude summary judgment.

### III.  CONCLUSION

[¶34]   Viewed in the light most favorable to Adeyanju, the summary judgment record reveals genuine issues of material fact as to whether Foot and Ankle had a legitimate nondiscriminatory reason for terminating Adeyanju's employment, whether its stated reason was pretextual, and whether Foot and

Ankle had a mixed discriminatory and nondiscriminatory motive for terminating Adeyanju's employment.

The entry is:

> Summary judgment vacated.  Remanded for
> further proceedings.

---

John P. Gause, Esq., Eastern Maine Law, LLC, P.A., Bangor, for appellant Rebecca Adeyanju

Jay S. Gregory, Esq., Gordon Rees Scully Mansukhani, Boston, Massachusetts, for appellee Foot and Ankle Associates of Maine, P.A.

Cumberland County Superior Court docket number CV-2022-132
FOR CLERK REFERENCE ONLY